**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**IN RE: Subpoena No. 25-1431-014**

## <u>MOTION TO LIMIT SUBPOENA</u>

On June 12, 2025, Subpoena No. 25-1431-014 ("Subpoena") was issued by Requestor, The United States of America Department of Justice ("Requestor"), upon Respondent, The Children's Hospital of Philadelphia ("Respondent" or "CHOP"), pursuant to 18 U.S.C. § 3486. Requestor is an agency pursuant to 5 U.S.C § 701(b)(1) and the Subpoena is administrative pursuant to 18 U.S.C § 3486. The return date listed on the Subpoena is July 9, 2025.

The Subpoena seeks health information for Respondent's patients, including those who sought treatment for gender dysphoria. In demanding such records, the Subpoena violates the privacy rights of the CHOP patients affected and fails to account for the special character of the records sought.

Respondent hereby moves this Court pursuant to 18 U.S.C § 3486(a)(5) for an order limiting the sections, identified below, of the Subpoena. Respondent's Motion is timely as it is filed before the Subpoena return date. *Id.* In support of this Motion, Respondent incorporates the argument and law set forth in its accompanying Memorandum of Law. Specifically, Respondent seeks to limit the Subpoena to exclude the following:

- Request 11: "[d]ocuments sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

- Request 12: "documents relating to the clinical indications, diagnoses, or assessments

that formed the basis for prescribing puberty blockers or hormone therapy" "[f]or each

such patient identified in [Request 11]."

- Request 13: "[a]ll documents relating to informed consent, patient intake, and parent

  or guardian authorization for minor patients identified in [Request 11]," "including any

  disclosures about off-label use (*i.e.*, uses not approved by the United States Food and

  Drug Administration) and potential risks."

- Any and all other Requests enumerated in the Subpoena (Request 1 through Request

  15) to the extent that such Requests or sub-Requests call for the production of health

  information of CHOP patients.

**WHEREFORE**, Respondent respectfully requests that this Court Limit the Subpoena as

requested in this motion.

Respectfully submitted,

 /s/ *Lawrence G. McMichael*
Lawrence G. McMichael (Pa. ID 28550)
Nina C. Spizer (Pa. ID 82443)
Dilworth Paxson LLP
1650 Market Street, Suite 1200
Philadelphia, PA 19103
(215) 575-7000
lmcmichael@dilworthlaw.com
nspizer@dilworthlaw.com

Martine E. Cicconi * *Pro Hac Vice pending*
Charles F. Connolly * *Pro Hac Vice pending*
Raphael R. Prober * *Pro Hac Vice pending*
Akin Gump Strauss Hauer & Feld
2001 K ST, N.W.
Washington, D.C., 20006
Tel: 202-887-4024
mcicconi@akingump.com
cconnolly@akingump.com
rprober@akingump.com

*Attorneys for Respondent,*
*The Children's Hospital of Philadelphia*

## CERTIFICATION OF COUNSEL

Pursuant to E.D.Pa. L. Civ. R. 26.1(f), I hereby certify, based on information provided by co-counsel, that the parties, after reasonable effort, are unable to resolve the dispute underlying the foregoing *Motion to Limit Subpoena*.

 /s/ *Lawrence G. McMichael*
_____
Lawrence G. McMichael

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re Administrative Subpoena 25-1431-014 | Case No.<br><br>Assigned To<br><br><br>Date Action Filed:   July 8, 2025 |

---

MEMORANDUM IN SUPPORT OF
MOTION TO LIMIT THE *SUBPOENA DUCES TECUM* ISSUED ON JUNE 12, 2025

---

.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................4

    A.    CHOP's Gender & Sexuality Development Program.............................4

    B.    Executive Branch Policies Relating to Treatment for Gender Dysphoria in Minors............................................................................................6

    C.    The Subpoena.......................................................................................7

LEGAL STANDARD ...........................................................................................9

ARGUMENT ........................................................................................................9

I.     THE PRIVACY INTERESTS OF CHOP PATIENTS FAR OUTWEIGH DOJ'S NEED FOR ACCESS .....................................................................9

    A.    The *Westinghouse* Factors Addressing Privacy Interests Strongly Favor Limiting the Subpoena ...............................................................10

          1.    *"The type of record requested" and "the information it does or might contain" (Factors 1 and 2)* .............................................10

          2.    *"The potential for harm in any subsequent nonconsensual disclosure" (Factor 3)* ...........................................................13

          3.    *"The injury from disclosure to the relationship in which the record was generated" (Factor 5)*.......................................................15

    B.    The *Westinghouse* Factors on the Other Side of the Ledger Do Not Outweigh the Privacy Interest.................................................................17

          1.    *"The adequacy of safeguards to prevent unauthorized disclosure" (Factor 4)* ..................................................................17

          2.    *"The degree of need for access," and "whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access" (Factors 6 and 7)* ....................20

CONCLUSION....................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Buckman v. Verazin*,
  54 A.3d 956 (Pa. Super. Ct. 2012) ...........................................................................15

*Doe v. Southeastern Pa. Transp. Auth. (SEPTA)*,
  72 F.3d 1133 (3d Cir. 1995)............................................................................12, 14

*In re Fortieth Statewide Investigating Grand Jury*,
  220 A.3d 558 (Pa. 2019) .........................................................................................1

*Haw. Psychiatric Soc., Dist. Branch of Am. Psychiatric Ass'n v. Ariyoshi*,
  481 F. Supp. 1029 (D. Haw. 1979) .......................................................................11

*Murray v. Pittsburgh Bd. of Educ.*,
  759 F. Supp. 1178 (W.D. Pa. 1991)................................................................11, 13

*Nw. Mem. Hosp. v. Ashcroft*,
  362 F.3d 923 (7th Cir. 2004) ...............................................................................9, 17

*Purl v. U.S. Dep't of Health & Human Servs.*,
  No. 24-CV-228-Z, 2025 WL 1708137 (N.D. Tex., June 18, 2025) .......................21

*Salcedo v. Milton S. Hershey Med. Ctr.*,
  19-cv-02201, 2024 WL 476888 (M.D. Pa. Feb. 7, 2024).......................................10

*In re Search Warrant*,
  810 F.2d 67 (3d Cir. 1987).....................................................................................12

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950)..................................................................................................9

*United States v. Powell*,
  379 U.S. 48 (1964)....................................................................................................9

*United States v. Westinghouse Elec. Corp.*,
  638 F.2d 570 (3d Cir. 1980).......................................................................... *passim*

*United States v. Westinghouse Elec. Corp.*,
  788 F.2d 164 (3d Cir. 1986).....................................................................................9

*Wilson v. Pa. State Police Dep't*,
  No. 94–6547, 1999 WL 179692 (E.D. Pa. Mar. 11, 1999)....................................12

**Statutes**

5 U.S.C. § 552a .................................................................................................................18, 19

18 U.S.C. § 3486 ................................................................................................................. *passim*

29 U.S.C. § 657(b) ....................................................................................................................21

29 U.S.C. § 669(b) ....................................................................................................................21

**Other Authorities**

45 C.F.R. § 160.103 .............................................................................................................12, 21

45 C.F.R. § 164.502 ..................................................................................................................21

65 Fed. Reg. 82462, 82464 (Dec. 28, 2000) ............................................................................11

89 Fed. Reg. 32976, 32986, 33005 (Apr. 26, 2024) ............................................................12, 21

Executive Order 13181, To Protect the Privacy of Protected Health Information in
    Oversight Investigations (Dec. 20, 2000) ......................................................................18

Executive Order 14187, Protecting Children From Chemical and Surgical
    Mutilation (Jan. 28, 2025)..................................................................................6, 7, 13

James Lynch, *FBI Launches Investigation into Alleged Genital Mutilation at
    Children's Hospitals*, NAT'L REV. (June 25, 2025),
    https://www.nationalreview.com/news/fbi-launches-investigation-into-
    alleged-genital-mutilation-at-childrens-hospitals/ ..........................................................19

Liz Essley Whyte, *Trump Administration Weighs Eliminating Funds for Hospitals
    Offering Gender Care to Minors*, WALL ST. J. (June 30, 2025),
    https://www.wsj.com/health/healthcare/gender-surgery-childrens-hospitals-
    trump-282c4cbb?reflink=desktopwebshare_permalink ....................................................19

Letter from U.S. Dep't of Just., Off. Leg. Affairs to Hon. John Linder, Chairman,
    Subcomm. on Rules & Organization of House Comm. on Rules, at 3 (Jan. 27,
    2000),
    https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/linder.pdf ....................19

Mem. from Att'y Gen., *Preventing the Mutilation of American Children* (Apr. 22,
    2025), https://www.justice.gov/ag/media/1402396/dl ............................................7, 13, 18, 20

Mem. from Brett A. Shumate, Ass't Att'y Gen., U.S. Dep't of Just., *Civil Division
    Enforcement Priorities* (June 11, 2025),
    https://www.justice.gov/civil/media/1404046/dl?inline ..........................................................7

U.S. Dep't of Health & Human Servs., *Whistleblower Tips and Complaints Regarding the Chemical and Surgical Mutilation of Children*, https://www.hhs.gov/protect-kids/index.html (Apr. 14, 2025)................................................20

U.S. Dep't of Just., Civil Rights Div., *When Does the Division Announce Investigations?* (Oct. 18, 2018), https://www.justice.gov/crt/when-does-division-announce-investigations ...............................................................19

U.S. Dep't of Just., Just. Manual § 1-7.000 (Apr. 2018) ...............................................19

U.S. Dep't of Just., Just. Manual, § 9-44.150 (Jan. 2020) ............................................18

U.S. Dep't of Just., Off. of Inspector Gen., *An Investigation of Alleged Misconduct by Senior DOJ Officials for Leaking Department Investigative Activities Concerning COVID-19 in Nursing Homes to Members of the News Media in October 2020* (Rev. Jan. 2025), https://oig.justice.gov/sites/default/files/2025-02/foiaroom-25-007_revised.pdf...................19

U.S. Dep't of Just., Off. of Inspector Gen., *An Investigation of Alleged Misconduct by United States Attorney Rachael Rollins* (May 2023), https://oig.justice.gov/sites/default/files/reports/23-071.pdf ..................................19

U.S. Dep't of Just., Off. of Inspector Gen*., A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe* (Feb. 2018), https://oig.justice.gov/reports/2018/o20180413.pdf......................................19

**INTRODUCTION**

For decades, the Third Circuit has emphasized the distinctive privacy concerns raised by efforts to compel disclosure of medical records.  As that court has explained, "[i]nformation about one's body and state of health is matter which the individual is ordinarily entitled to retain within the private enclave where he may lead a private life." *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980) (citations omitted).  For that reason, "[i]t has been recognized in various contexts that medical records and information stand on a different plane than other relevant material." *Id.*  "This difference in treatment reflects a recognition that information concerning one's body has a special character." *Id.*; *see also In re Fortieth Statewide Investigating Grand Jury*, 220 A.3d 558, 570 (Pa. 2019) ("[P]atients' medical records should be protected from public disclosure because such revelation would impermissibly infringe on the patients' individual privacy interest in avoiding disclosure of personal matters.").

On June 12, 2025, the Department of Justice ("DOJ") issued an administrative subpoena ("the Subpoena") to The Children's Hospital of Philadelphia ("CHOP") that fails to account for the "special character" of medical records. *Westinghouse*, 638 F.2d at 577.  Instead of giving due respect to the obvious privacy concerns inherent in the collection of patient medical information, DOJ propounded a uniquely invasive demand for documents from a uniquely vulnerable population: CHOP patients who sought treatment for gender dysphoria, including with puberty-blocking medication and hormone therapy.  Specifically, DOJ subpoenaed personalized records related to those patients' assessment, diagnosis, and treatment—complete with "name[s], date[s] of birth, social security number[s], address[es], and parent/guardian information."[1]

---

[1] Ex. A, *Subpoena Duces Tecum* to the Children's Hospital of Philadelphia, No. 25-1431-014 (June 11, 2025) ("Subpoena") at Request 11.

DOJ's Subpoena singles out a group of patients who have struggled with deeply personal issues concerning gender, and who have been victims of harassment and discrimination. The subpoenaed records reveal the most intimate, sensitive, and often painful details of their young lives. But DOJ's extraordinary demand not only harms the patients whose records are at issue; it also threatens the relationship CHOP shares with *all* of its patients—a relationship built on trust that cannot survive if that trust is breached. With so much at stake, CHOP is compelled to seek relief from this Court in the form of an order limiting the Subpoena to exclude demands for its patients' health information.

Third Circuit precedent mandates that result. Under the seven-factor test articulated in *Westinghouse*, the privacy interests that CHOP patients maintain in their records overwhelmingly outweigh DOJ's need for the information sought. The exceptionally sensitive records subject to the Subpoena make clear that privacy interests are at their apex. And the harm from disclosure, which would be substantial given the nature of the records alone, is magnified here because of the government's publicly professed opposition to current medical treatment for gender dysphoria in minors. Given that opposition, the affected patients—many of whom already harbor concerns that they will be surveilled or targeted on account of their transgender status—will likely find the concept that federal prosecutors will become privy to their most personal medical information extremely distressing.

Worse still, DOJ has indicated that its purpose in seeking patient health records is to probe issues surrounding informed consent—suggesting that DOJ will use the medical information produced to seek out certain patients (or all of them) to collect information about what they and their parents/guardians discussed with their providers when they initiated treatment. Such interactions risk seriously undermining patients' mental health if they are made to worry that their

healthcare providers and parents or guardians are in jeopardy as a result of DOJ's investigation. DOJ's outreach could also "out" patients if their transgender status is revealed to friends, colleagues, or peers who were previously unaware. And of course, all affected patients can be expected to endure significant trauma if their most intimate medical information becomes public through a subsequent disclosure of information collected pursuant to the Subpoena.

That compliance with the Subpoena would pose an existential threat to the relationship between CHOP and other patient groups is an equally important consideration and one that equally weighs in favor of limitation. If patients—and the parents and guardians singularly focused on protecting their health—fear that the government will have unfettered access to sensitive information about their symptoms, diagnoses, and treatment, they will constrain their candor in conversations with clinical providers or, even worse, hesitate to seek medical care altogether. In short, allowing the government to obtain these records will result in a chilling effect that extends beyond patients treated for gender dysphoria to other patients who rely on CHOP each day for critical and often life-saving medical care, delivered in accord with the highest medical standards.

These first-order privacy interests easily overcome any need or right of access on the other side of the ledger. The general statutory authority that DOJ invokes to issue the Subpoena, codified at 18 U.S.C. § 3486, does not speak to the specific privacy concerns raised by this Subpoena. Nor does DOJ's need for the information tip the balance. DOJ has multiple avenues to investigate billing practices, marketing and use of off-label drugs, and informed consent—the three issues DOJ has indicated are its focus. But DOJ cannot (and should not) use an administrative subpoena to compile a list of patients who wish to maintain anonymity, and then mine their medical records to facilitate an even more intrusive probe into the intimate details of their lives.

For the avoidance of doubt, CHOP does not categorically contest DOJ's authority to review its conduct or to initiate an investigation through a subpoena issued under 18 U.S.C. § 3486. It thus does not ask this Court to set aside the Subpoena in its entirety. Rather, CHOP's request is a narrow one: allow CHOP to protect the privacy interests of patients entrusted to its care by limiting the Subpoena in a targeted fashion to exclude the following:

- Request 11: "[d]ocuments sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

- Request 12: "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy" "[f]or each such patient identified in [Request 11]."

- Request 13: "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11]," "including any disclosures about off-label use (*i.e.*, uses not approved by the United States Food and Drug Administration) and potential risks."

- Any and all other Requests enumerated in the Subpoena (Request 1 through Request 15) to the extent that such Requests or sub-Requests call for the production of health information of CHOP patients.

Such relief is necessary and appropriate. Indeed, the Third Circuit's binding precedent, the privacy interest of an exceptionally vulnerable patient population, and the hallowed physician-patient relationship demand no less.

## BACKGROUND

### A. CHOP's Gender & Sexuality Development Program

CHOP was the first hospital in the United States dedicated exclusively to pediatric care. CHOP strives to be the world leader in the advancement of healthcare for children by integrating

state-of-the-art patient care, innovative research, and quality professional education into all its programs.

In 2014, CHOP opened its Gender and Sexuality Development Program (the "Program"), which offers psychosocial and medical support for transgender children, adolescents, young adults and their families. *See generally*, Ex. B, Declaration of Linda Hawkins and Dr. Nadia Dowshen ("Hawkins & Dowshen Decl."). The team includes specialists in gender identity development from Social Work and Family Services, Adolescent Medicine, Endocrinology, and Behavioral Health. The Program provides services based on individual and family needs, including comprehensive assessments, monthly support groups, connections to community resources, and, where appropriate, medical care. Care provided by the Program is and has always been consistent with standards of care supported by leading medical organizations.

All families that come to the Program begin with an assessment conducted by a licensed mental health provider. The patient and the parent(s)/legal guardian(s) then have a series of appointments with a licensed mental health specialist specifically trained in child and adolescent development. *Id.* ¶ 4. Assessment appointments are completed with both the patient and parent(s)/legal guardian(s) to understand the patient's history of gender expression and identity. *Id.* ¶ 5. If a diagnosis of gender dysphoria is being considered, the assessment process will include a comprehensive psychosocial evaluation of the patient, as well as an evaluation of the patient's cognitive abilities, executive function skills, communication skills, emotional functioning, self-awareness/social cognition, and capacity for decision-making. *Id.* ¶ 6. Any and all care plans or recommendations are determined based on the diagnostic outcome of the assessment process and are dependent on the patient's age and development, as well as the particular needs of the patient and the family. *Id.* ¶ 7.

After the assessment process, if the patient is diagnosed with gender dysphoria and the patient, family, and multidisciplinary care team agree to treatment, the patient, the family, and the care team proceed with the agreed-upon plan of care.  *Id.* ¶ 8.  Consistent with the shared decision-making model, prior to any medical treatment being administered, a physician and mental health provider discuss the patient's needs, the recommended treatment, treatment risks, benefits, and alternatives, and any concerns or other issues with the parent(s) or legal guardian(s) and the patient. *Id.* ¶ 9.  Per the Program's standard practice, medical treatments, including puberty-blocking medication and hormone therapy, proceed only after informed consent is properly obtained.  *Id.* ¶ 10.

**B.  Executive Branch Policies Relating to Treatment for Gender Dysphoria in Minors**

The current Administration has made no secret of its views with respect to gender-dysphoria treatment for minors.  On January 28, 2025, barely one week after taking office, President Trump issued Executive Order 14187, entitled "Protecting Children From Chemical and Surgical Mutilation."  ("E.O. 14187").  In that Order, President Trump proclaimed that "[a]cross the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions."  *Id.* § 1.  E.O. 14187 defined "chemical and surgical mutilation" as "the use of puberty blockers . . . to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex"; "the use of sex hormones . . . to align an individual's physical appearance with an identity that differs from his or her sex"; and "surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex."  *Id.* § 2(c).  "Chemical and surgical mutilation," E.O. 14187 stated, "sometimes is referred to as 'gender affirming care'."  *Id.*  Among

other commands, the E.O. directed the Attorney General to prioritize certain investigations related to such care.  *Id.* § 8.

Attorney General Pam Bondi soon complied with that directive.  On April 22, 2025, Attorney General Bondi issued a Memorandum for Select Component Heads, with the subject "Preventing the Mutilation of American Children."[2]  The Memo pledged that, pursuant to E.O. 14187, DOJ would adhere to certain priorities, including investigating alleged violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors making false claims about the on- or off-label use of puberty blockers and sex hormones, and evaluating whether healthcare providers submitting claims to federal health care programs violated the False Claims Act in connection with the provision of gender affirming care.  *Id.* at 4.[3]  The Memo also announced that DOJ would launch "The Attorney General's Coalition Against Child Mutilation," through which the Department would "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners violating federal or state laws banning female genital mutilation and other, related practices."  *Id.* at 5.

**C.  The Subpoena**

On June 12, 2025, DOJ's Consumer Protection Branch issued a *subpoena duces tecum* to CHOP pursuant to section 248 of the Health Insurance Portability & Accountability Act of 1996 ("HIPAA"), 18 U.S.C. § 3486 ("the Subpoena").   At a high level, the Subpoena seeks the following categories of documents: files for any personnel responsible for directing CHOP's affairs and personnel who prescribe medication (irrespective of whether they are involved in

---

[2]  Mem. from Att'y Gen., *Preventing the Mutilation of American Children* (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (the "AG Memo").

[3]  Those directives were repeated in a memorandum issued by the Assistant Attorney General for the Civil Division, Brett Shumate.  *See* Mem. from Brett A. Shumate, Ass't Att'y Gen., U.S. Dep't of Just., *Civil Division Enforcement Priorities* (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline.

treatment for gender dysphoria); documents regarding the promotion of off-label uses of puberty blockers and cross-sex hormones; documents related to billing records and practices, insurance claims, diagnosis codes, and the use of puberty blockers and hormones in connection with gender-related care; and documents related to any adverse event connected with such care.

Beyond those categories, many or all of which likely capture some health information of CHOP patients, the Subpoena includes three requests (11, 12, and 13) that undeniably call for such sensitive information.  Request 11 seeks "[d]ocuments sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."  Request 12 asks for "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy" "[f]or each such patient identified in [Request 11]."  And Request 13 demands "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11]," "including any disclosures about off-label use (*i.e.*, uses not approved by the United States Food and Drug Administration) and potential risks."

On July 7, 2025, two days before the Subpoena's return date, counsel for CHOP met with DOJ and explained that, while the hospital would produce some records responsive to the Subpoena, it could not compromise the privacy of its patients by providing their confidential health information.  Counsel informed DOJ that CHOP's objection covers all aspects of the Subpoena calling for health information of CHOP patients, including but not limited to Requests 11, 12, and 13.[4]

---

[4] Counsel further informed DOJ that it has substantial concerns about the scope of and burden imposed by other Requests, including those related to personnel records.  CHOP intends to press those arguments in negotiations regarding production with DOJ, but reserves all rights to object on such grounds as scope and burden should negotiations fail and the issues become ripe for judicial review.

## LEGAL STANDARD

The Third Circuit has held that "[c]ourts will enforce a[n administrative] subpoena if (1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome." *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166 (3d Cir. 1986) (*citing United States v. Powell*, 379 U.S. 48, 57–58 (1964); *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)). "In addition, if a subpoena is issued for an improper purpose, such as harassment, its enforcement constitutes an abuse of the court's process." *Id.* at 166-67.

Even where a subpoena "satisfies the criteria for judicial enforcement," a court must consider seven factors in determining whether "an intrusion into an individual's privacy is justified." *Westinghouse*, 638 F.2d at 576, 578. Those factors are:

> The type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Id.* at 578.

## ARGUMENT

## I.    The Privacy Interests of CHOP Patients Far Outweigh DOJ's Need for Access

The *Westinghouse* factors compel the conclusion that the Subpoena must be limited to exclude CHOP patients' health information.[5]  As described below, the Subpoena seeks exceptionally sensitive information from a particularly vulnerable patient population.  It thus risks imposing significant trauma on patients and families who did nothing more than seek out lawful

---

[5] *Westinghouse* also establishes that CHOP has standing to assert the privacy rights of its patients. *See* 638 F.2d at 574 & n.3; *see also Nw. Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 928 (7th Cir. 2004) ("The government does not deny that the hospital is an appropriate representative of the privacy interests of its patients.").

medical care.  It also threatens the foundation of the relationship between healthcare providers and their patients.  No incremental need for information or general statutory authority can justify such intrusive, and ultimately destructive, demands.  *See Salcedo v. Milton S. Hershey Med. Ctr.*, 19-cv-02201, 2024 WL 476888, at *14 n.13 (M.D. Pa. Feb. 7, 2024) (describing "the historical recognition within this circuit that confidential medical information merits protection from public dissemination") (citing *Westinghouse*, 638 F.2d at 577).

## A.  The *Westinghouse* Factors Addressing Privacy Interests Strongly Favor Limiting the Subpoena

### 1.  *"The type of record requested" and "the information it does or might contain" (Factors 1 and 2)*

Two features of the information DOJ seeks regarding CHOP patients warrant this Court's close attention: First, the Subpoena seeks documents concerning assessments and diagnoses underlying the decisions to prescribe puberty blockers and hormone therapy to patients suffering from gender dysphoria (*see* Subpoena Requests 12–13); and second, the Subpoena demands documents revealing the patients associated with those assessments and diagnoses *by name* (*see* Subpoena Request 11).  By seeking both categories of documents, the Subpoena targets personalized information about the most intimate details of the lives and health of CHOP patients.

The Program's process for determining whether to prescribe puberty blockers and hormone therapy involves extensive patient assessments, including "a comprehensive psychosocial evaluation of the patient, as well as an evaluation of the patient's cognitive abilities, executive function skills, communication skills, emotional functioning, self-awareness/social cognition, and capacity for decision-making."  Hawkins & Dowshen Decl. ¶ 6.  Documents created during that process are at the heart of material responsive to the Subpoena.  *See* Subpoena Request 12 (demanding "documents relating to the clinical indications, diagnoses, or assessments that formed

the basis for prescribing puberty blockers or hormone therapy"), & 13 (demanding "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization"). As explained in the accompanying Declaration from the Program's co-founders, such records may contain the most intimate details about patients, "often touching on such subjects as discomfort with specific body parts, sexual history, past trauma, interfamilial dynamics, use of self-harm or other negative coping mechanisms that might risk their health and well-being such as disordered eating, and experiences of harassment and bullying." Hawkins & Dowshen Decl. ¶ 14.

"There can be no doubt that [this] information [is] of the types most associated with expectations of privacy." *Murray v. Pittsburgh Bd. of Educ.*, 759 F. Supp. 1178, 1181 (W.D. Pa. 1991). Indeed, the federal government has expressly acknowledged that such information is uniquely deserving of protection. As the Department of Health and Human Services ("HHS") has explained in the context of psychotherapy notes, "[i]f, in Justice Brandeis' words, the 'right to be let alone' means anything, then it likely applies to having outsiders have access to one's intimate thoughts, words, and emotions." Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82464 (Dec. 28, 2000); *see also Haw. Psychiatric Soc., Dist. Branch of Am. Psychiatric Ass'n v. Ariyoshi*, 481 F. Supp. 1029, 1038 (D. Haw. 1979) ("Constitutionally protected privacy must, at a minimum, include the freedom of an individual to choose the circumstances under which, and to whom certain of his thoughts and feelings will be disclosed.); *see also id*. ("Many courts and commentators have concluded that, because of the uniquely personal nature of mental and emotional therapy, accurate diagnosis and effective treatment require a patient's total willingness to reveal the most intimate personal matters, a willingness that can exist only under conditions of the strictest confidentiality.").

"Information about an individual's reproductive health is also especially sensitive and has long been recognized as such."  HIPAA Privacy Rule to Support Reproductive Health Care Privacy, 89 Fed. Reg. 32976, 32986, 33005 (Apr. 26, 2024) ("HIPAA Reproductive Health Privacy Rule"); *see also id*. at 33063 (codified at 45 C.F.R. § 160.103) (defining "reproductive health care" as "health care . . . that affects the health of an individual in all matters relating to the reproductive system and to its functions and processes").  Accordingly, the information covered by the Subpoena is orders of magnitude more sensitive and its potential disclosure far more invasive and consequential than the records at issue in *Westinghouse*, which included "results of routine testing, such as X-rays, blood tests, pulmonary function tests, hearing and visual tests." 638 F.2d at 579; *see also id.* ("Westinghouse has not produced any evidence to show that the information which the medical records contain is of such a high degree of sensitivity that the intrusion could be considered severe or that the employees are likely to suffer any adverse effects from disclosure to [agency] personnel."); *see also Doe v. Southeastern Pa. Transp. Auth. (SEPTA)*, 72 F.3d 1133 (3d Cir. 1995) (addressing privacy interest in prescription records); *cf. In re Search Warrant*, 810 F.2d 67, 72 n.5 (3d Cir. 1987) (leaving open the possibility that "psychiatric records" or records of "socially stigmatizing" conditions "merit a higher degree of privacy sufficient to outweigh legitimate governmental interests in acquiring the information contained therein").

Tying such critically sensitive information to named patients exacerbates the privacy intrusion.  The Third Circuit has indicated that, where health records are associated with a particular individual, the interest in keeping the information confidential increases exponentially. *See SEPTA*, 72 F.3d at 1138; *see also Wilson v. Pa. State Police Dep't*, No. 94–6547, 1999 WL 179692, at *2 (E.D. Pa. Mar. 11, 1999) ("Application of the *Westinghouse* factors here militates in favor of disclosure of the information . . . but not of the names and addresses . . .").  DOJ's

explicit request that the records identify patients, coupled with the highly sensitive nature of the records at issue, leaves no doubt that the privacy interests at stake are paramount.[6]

2.    *"The potential for harm in any subsequent nonconsensual disclosure"* *(Factor 3)*

Courts "rank as an exceptionally serious matter" the "embarrass[ment]" flowing from "the disclosure of sensitive personal information." *Murray*, 759 F. Supp. at 1182. Those concerns abound here. As the co-founders of the Program explain, if the sensitive and intimate details covered by the Subpoena "were somehow made public" through leaks or otherwise, patients of the Program "could experience embarrassment, humiliation, and trauma from knowing they were publicly accessible." Hawkins & Dowshen Decl. ¶ 18. Moreover, "[b]ecause the information called for by the Subpoena would encompass records that could include discussion of patients' parents, siblings, friends, teachers, coaches and others, the potential for exposure of sensitive details, embarrassment, humiliation, and trauma extends to those who have little or no connection to the Program and no idea that information concerning them is at issue." *Id.* ¶ 19.

As devastating as a subsequent, nonconsensual disclosure would be, no such subsequent disclosure need occur for harm to ensue. Rather, even *awareness* of the Subpoena's request for patient-specific information would detrimentally impact the patient community. "[P]atients of the Program harbor substantial fears that they are being surveilled or targeted for exposure by opponents of the treatment"—fears that have worsened as prominent government officials have publicly espoused the position that such treatment is tantamount to "maiming" and "mutilation." *Id.* ¶ 13; *see also* E.O. 14187; AG Memo at 1. "Patients and their parents have expressed grave

---

[6] Given the nature of the records, redacting the names of patients or using pseudonyms would not mitigate the privacy concerns. The details included in patient files would indicate, for example, the patient's location, the occupation of their parents, ages of their siblings, etc. Armed with those details, it would be far too easy to uncover a patient's identity. Furthermore, the number of patients and number of records associated with each patient would make redaction or use of pseudonyms overly burdensome and extremely expensive and time consuming.

concern with their . . . confidential patient-provider healthcare information being made public, even to investigatory bodies."  Hawkins & Dowshen Decl. ¶ 13.  "They have identified that this fear will deter them from participating in the activities that are hallmarks of a happy childhood— school, clubs and other extracurricular activities—out of concern that they will be singled out for being transgender."  *Id*.  "The mere fact that DOJ has requested detailed information about the treatment they received through the Program will exacerbate patients' fears of being targeted, potentially leading them to further withdraw from public spaces and compromising their ability to live rich, full lives."  *Id.*[7]

If patient medical information were disclosed to DOJ, that disclosure would be highly damaging in its own right.  *Cf. SEPTA*, 72 F.3d at 1141 (recognizing that "potential harm must be measured within the context of the disclosure that actually occurred").  It appears that DOJ's intention in seeking patient information in an identifiable format, including "documents relating to informed consent, patient intake, and parent or guardian authorization" (Subpoena Request 13), is to approach patients to probe their experiences further.  Such interactions with the government, which may be unwelcome to many (if not all) patients, threaten significant harm.

Patients of the Program are often "extremely reticent to discuss their experience with gender dysphoria with anyone outside of their family and clinical team, much less federal law enforcement officials."  Hawkins & Dowshen Decl. ¶ 15.  "The prospect of being interviewed by federal agents and prosecutors, particularly in light of DOJ's publicly professed opposition to medical treatment for minor patients suffering from gender dysphoria, would be extremely distressing."  *Id*.  "[M]any patients of the Program view the medical care they receive to treat their

---

[7] As explained in the accompanying Motion to Seal, these concerns animate CHOP's effort to keep this matter off the public docket.  Granting this Motion would limit the risk of alarming the patient community by revealing the possibility that their records could be disclosed.  It would also limit the risk of threats and violence that could follow public attention to this issue.  DOJ's opposition to CHOP's Motion to Seal runs counter to those aims.

gender dysphoria as a lifeline. Being questioned about that care and made to feel that their statements could call into question the actions of parents and guardians who supported them, and the healthcare providers who treated them . . . could cause feelings of guilt and fear that would be very damaging to their mental health . . . and could even result in thoughts of, or completed, suicide." *Id.* ¶ 16. And for patients who are living as the gender with which they identify and may not share their experience with gender dysphoria widely or at all, "being approached by investigators to discuss their treatment could effectively 'out' them as transgender." *Id.* ¶ 17. That would not only "tak[e] the critical and highly personal decision to share that aspect of their lives out of their hands," it would, tragically, expose them "to an increased risk of harassment, discrimination, and violence." *Id.*

For all of these reasons, the harm associated with disclosure of records sought by the Subpoena cannot be overstated.

3.    *"The injury from disclosure to the relationship in which the record was generated" (Factor 5)*

The same is true for the harm to the relationship in which the records were created—the critical relationship between physician and patient. As explained in the Declaration from CHOP's Physician-in-Chief and Chair of the Department of Pediatrics, "[t]he patient-provider relationship is fundamental to people living healthy, productive lives." Ex. C, Decl. of Dr. Joseph St. Geme III ("St. Geme Decl.) ¶ 7. "Confidentiality is central to that relationship, as patients often assume that, in general, sensitive personal information they share with their providers will not be disclosed further." *Id.*; *cf. Buckman v. Verazin*, 54 A.3d 956, 961 (Pa. Super. Ct. 2012) ("'[T]he personal nature of the information [patients' medical records] contain results in an obligation on the part of the hospital to maintain the confidentiality of the records.") (citations omitted). "Although patients and their families may understand that insurance companies and government agencies may be able

to access their records to some degree, they do not expect that federal prosecutors and investigators will have unfettered access to their most sensitive health information simply because of the condition for which they sought medical care, and the treatment they received." St. Geme Decl. ¶ 7. "[I]f patients and families became aware of DOJ's Subpoena, they would be more hesitant to seek medical care, resulting in fewer patients accessing necessary medical treatment. Just as importantly, those that do seek treatment may be reluctant to disclose particularly sensitive personal information out of fear of similar government requests, making it more difficult for medical providers to accurately diagnose and provide effective care to their patients." *Id.* ¶ 8.

That stands in stark contrast to the facts of *Westinghouse*, which concerned the employer-employee relationship, and in which the court found it unlikely "that the disclosures [would] inhibit the employee from undergoing subsequent periodic examinations required of Westinghouse employees." 638 F.2d at 579. Here, the chilling effect absent from *Westinghouse* not only is present, but it has significant implications for public health and safety. As the Declaration explains, if "patient families believe sensitive health information of their child may be shared in undesired ways, trust is undermined and effective discussions about medical care are more challenging." St. Geme Decl. ¶ 12. "[P]ediatric patients who have had their trust in the medical profession compromised in this manner may delay or forgo necessary medical care, compromising their long-term health outcomes*." Id.*

Moreover, "the potential harms associated with DOJ's Subpoena would not be limited to patients of the Program." St. Geme Decl. ¶ 9. Rather, "[c]ompliance with the subpoena would set a precedent that federal law enforcement agencies can seek and obtain sensitive health information of anyone based on skepticism about a particular form of medical treatment." *Id*. In a world where medical treatment is increasingly the subject of intense debate, that could spark fear among patients

16

and their families.  The knowledge that CHOP is producing patient records in response to a DOJ subpoena would "exacerbate those types of fears to the detriment of the patients and families concerned about the government's focus on conditions affecting their children." *Id.* ¶ 11.  At least some such patients and families might logically resist seeking medical care, particularly at CHOP. *Cf. Nw. Mem. Hosp.*, 362 F.3d at 929 ("If Northwestern Memorial Hospital cannot shield the medical records of its . . . patients from disclosure in judicial proceedings . . . the hospital will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment.").

### B.  The *Westinghouse* Factors on the Other Side of the Ledger Do Not Outweigh the Privacy Interest

   *1.  "The adequacy of safeguards to prevent unauthorized disclosure" (Factor 4)*

Factor 4 does not tilt the balance towards the Subpoena's full enforcement.  For one thing, no safeguards to protect against disclosure of information produced in response to the Subpoena will prevent the harm flowing from disclosure *to DOJ*.  As described above, that harm is real and significant. *See* pp. 14-15, *supra.*

Nor can the prospect of subsequent disclosures be ignored.  CHOP is unaware of any specific statutory or regulatory provision broadly prohibiting disclosure of patient specific health information obtained pursuant to a section 3486 subpoena.  Although section 3486(e)(1) sets a "limitation on use," that provision specifically refers to disclosures "for use in . . . any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information," 18 U.S.C. § 3486(e)—in other words, investigations and actions *against the patient*.  By its terms, subsection (e)(1) does not apply to any other disclosures.  And while the Justice Manual's section on Health Care Fraud states that "[t]here are restrictions on the derivative use of protected health information," the same section directs readers to an Executive

Order expressly stating that it does not "place any additional limitation on the derivative use of health information obtained by the Attorney General pursuant to the provisions of 18 U.S.C. 3486." *See* U.S. Dep't of Just., Just. Manual, § 9-44.150 (Jan. 2020) (citing Executive Order 13181, To Protect the Privacy of Protected Health Information in Oversight Investigations (Dec. 20, 2000) ("E.O. 13181"))[8]; *see also* E.O. 13181, § 1 ("Under 18 U.S.C. 3486, an individual's health records obtained for health oversight purposes pursuant to an administrative subpoena may not be used against that individual patient in an unrelated investigation by law enforcement unless a judicial officer finds good cause.").

Moreover, there is reason to think that DOJ *will* disclose the information learned pursuant to the Subpoena. As described, DOJ has announced its intention to partner with states to address issues related to medical treatment for gender dysphoria, including the use of puberty blockers and hormones. AG Memo at 5. That partnership will include "identify[ing] leads, shar[ing] intelligence, and build[ing] cases against hospitals and practitioners." *Id*. Absent a broad prohibition on sharing, *see* 18 U.S.C. § 3486(e)(1); 5 U.S.C. § 552a(b)(7) (Privacy Act provision permitting disclosure to state law enforcement officials), the AG's publicly professed intention to work with the states suggests that DOJ might well provide patient-specific data where relevant to law enforcement activity. Such information sharing would significantly raise the risk of the information becoming public. *Cf. Westinghouse*, 638 F.2d at 580 (describing government agency's extensive controls around information contained in medical files and specific restrictions on disclosure).

---

[8] *Available at* https://www.justice.gov/jm/jm-9-44000-health-care-fraud#9-44.100#9-44.100.

Similarly, some DOJ officials have indicated a willingness to disclose information to Congress despite the Department's historical practice of "declin[ing] to provide Congressional committees with access to open law enforcement files."[9]  FBI Director Kash Patel recently explained that he is "committed to congressional oversight" and to "giving Congress the documents they need to do their work *and give them to the American people*," adding that documents would be provided "unredacted."[10]  Such disclosures also are not subject to the Privacy Act, *see* 5 U.S.C. § 552a(b)(9), and thus could result in the public dissemination of sensitive patient information.

Unauthorized disclosures are possible as well.  Despite applicable statutes and DOJ rules and policies concerning the secrecy of active investigations,[11] revelations are not uncommon.  Indeed, details about related government efforts to gather information regarding providers of medical treatment for gender dysphoria have already leaked.[12]  Other confidential investigations have been reported in the press as well in recent years, and DOJ has also been accused of failing to comply with the non-disclosure obligations imposed under the Privacy Act.[13]

---

[9] Letter from U.S. Dep't of Just., Off. Leg. Affairs to Hon. John Linder, Chairman, Subcomm. on Rules & Organization of House Comm. on Rules, at 3 (Jan. 27, 2000), https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/linder.pdf.

[10] Chuck Grassley, *FBI Director Kash Patel Talks Senator Grassley Oversight with Joe Rogan*, Facebook (June 11, 2025), https://www.facebook.com/grassley/videos/fbi-director-kash-patel-talks-senator-grassley-oversight-with-joe-rogan-what-did/1006621698126020/.

[11] *See, e.g.*, Just. Manual § 1-7.000 (Apr. 2018), https://www.justice.gov/jm/jm-1-7000-media-relations; U.S. Dep't of Just., Civil Rights Div., *When Does the Division Announce Investigations?* (Oct. 18, 2018), https://www.justice.gov/crt/when-does-division-announce-investigations.

[12] *See, e.g.*, Liz Essley Whyte, *Trump Administration Weighs Eliminating Funds for Hospitals Offering Gender Care to Minors*, WALL ST. J. (June 30, 2025), https://www.wsj.com/health/healthcare/gender-surgery-childrens-hospitals-trump-282c4cbb?reflink=desktopwebshare_permalink; James Lynch, *FBI Launches Investigation into Alleged Genital Mutilation at Children's Hospitals*, NAT'L REV. (June 25, 2025), https://www.nationalreview.com/news/fbi-launches-investigation-into-alleged-genital-mutilation-at-childrens-hospitals/.

[13] *See e.g.*, U.S. Dep't of Just., Off. of Inspector Gen., *An Investigation of Alleged Misconduct by Senior DOJ Officials for Leaking Department Investigative Activities Concerning COVID-19 in Nursing Homes to Members of the News Media in October 2020* (Rev. Jan. 2025), https://oig.justice.gov/sites/default/files/2025-02/foiaroom-25-007_revised.pdf (a 2024 report from the DOJ's Office of the Inspector General found that three senior officials leaked

2.    *"The degree of need for access," and whether "there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access" (Factors 6 and 7)*

The final two factors likewise do not tip the scales in DOJ's favor. With respect to Factor 6, the need for access, DOJ has multiple avenues to investigate health care offenses without intruding on patient privacy. The Department can investigate off-label marketing of puberty blockers and hormone therapy without probing patient histories. It can review CHOP's billing practices without knowing what patients discussed in their psychosocial evaluations. And it can assess the Program's policies and practices for informed consent by reviewing those policies and practices, along with supporting documents. DOJ also has expressly solicited whistleblower testimony related to issues surrounding transgender health care for minors. *See* AG Memo at 4-5.[14] With many other options at its disposal, DOJ has no need to engage in a dragnet-style effort to gather information from unwilling patients, potentially traumatizing them and their loved ones in the process.

With respect to Factor 7, there is no dispute that 18 U.S.C. § 3486 affords DOJ latitude to undertake investigations of healthcare offenses. But that is not enough to justify the Subpoena's sweeping demand for health information about CHOP patients. If it were, the other *Westinghouse* factors would be entirely superfluous. The Third Circuit identified those factors as critical to the

---

non-public investigative information); U.S. Dep't of Just., Off. of Inspector Gen., *An Investigation of Alleged Misconduct by United States Attorney Rachael Rollins* (May 2023), https://oig.justice.gov/sites/default/files/reports/23-071.pdf (former United States Attorney provided reporters with non-public DOJ letters about ongoing civil rights matters); U.S. Dep't of Just., Off. of Inspector Gen., *A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe* (Feb. 2018), https://oig.justice.gov/reports/2018/o20180413.pdf (FBI Deputy Director authorized subordinate to confirm existence of confidential investigation). DOJ has also been imperfect in adhering to the Privacy Act. *See Strzok v. Barr et al.*, 19-cv-2367 (D.D.C. 2019).

[14] The FBI and HHS have made similar pleas. *See* FBI (@FBI), X (June 2, 2025, 1:15 PM), https://x.com/FBI/status/1929587710894739567; U.S. Dep't of Health & Human Servs., *Whistleblower Tips and Complaints Regarding the Chemical and Surgical Mutilation of Children*, https://www.hhs.gov/protect-kids/index.html (Apr. 14, 2025).

"delicate task of weighing [the] competing interests" when the government seeks information the disclosure of which raises significant privacy concerns. 638 F.3d at 578. Indeed, *Westinghouse* itself weighed those competing interests *after* recognizing "the comprehensive statutory scheme dealing with occupational health and safety" and the agency's authority "to issue subpoenas to obtain the production of evidence," *id.* at 575, 578-79 (citing 29 U.S.C. §§ 657(b), 669(b)). Accordingly, the simple fact that DOJ has statutory authority to issue a subpoena does not answer the question whether the Department's need for the information sought overcomes the essential privacy interests weighing against disclosure.[15]

***

DOJ's Subpoena strikes at the heart of the commitment CHOP holds above all others—protecting its patients. This commitment is a foundational feature of the care CHOP has provided to children within this community and around the world for 170 years. DOJ's Subpoena endangers that foundational commitment as much as it endangers the privacy of the patients whose records it compels. Such grave harms cry out for this Court's intervention.

---

[15] In any event, whether there is an "express statutory mandate [or] articulated public policy . . . militating toward access" (*Westinghouse*, 638 F.2d at 578) in this case is far from clear in light of the HIPAA Reproductive Health Privacy Rule. 89 Fed. Reg. 32976 (codified at 45 C.F.R. Parts 160 and 164). Under the Rule, CHOP could not disclose any records containing protected health information, including any information regarding "health care . . . that affects the health of an individual in all matters relating to the reproductive system and to its functions and processes," 45 C.F.R. § 160.103, in connection with "a criminal, civil, or administrative investigation into any person for the mere act of seeking, obtaining, or facilitating reproductive health care," 45 C.F.R. § 164.502(a)(5)(iii). Although the Reproductive Health Privacy Rule was vacated by a Texas district court last month, *see Purl v. U.S. Dep't of Health & Human Servs.*, No. 24-CV-228-Z, 2025 WL 1708137 (N.D. Tex., June 18, 2025), the time for appealing that ruling has not run and HHS has indicated that it has no other plans to invalidate the Rule. Accordingly, the Rule could come back into force and bar CHOP's disclosure to DOJ. Regardless of the Rule's fate, the fact that HHS recognized the unique sensitivity inherent in health records concerning the "functions and processes" of the reproductive system only underscores the profound privacy concerns implicated by the Subpoena.

## CONCLUSION

The Motion to Limit the Subpoena should be granted.


Dated: July 8, 2025                              Respectfully submitted,


                                                   /s/ *Lawrence G. McMichael*
                                                 Lawrence G. McMichael (Pa. ID 28550)
                                                 Nina C. Spizer (Pa. ID 82443)
                                                 Dilworth Paxson LLP
                                                 1650 Market Street, Suite 1200
                                                 Philadelphia, PA 19103
                                                 (215) 575-7000

                                                 Martine E. Cicconi * *Pro Hac Vice pending*
                                                 Charles F. Connolly * *Pro Hac Vice pending*
                                                 Raphael R. Prober * *Pro Hac Vice pending*
                                                 Akin Gump Strauss Hauer & Feld
                                                 2001 K ST, N.W.
                                                 Washington, D.C., 20006
                                                 Tel: 202-887-4024
                                                 mcicconi@akingump.com
                                                 cconnolly@akingump.com
                                                 rprober@akingump.com

                                                 *Attorneys for Respondent,*
                                                 *The Children's Hospital of Philadelphia*

**<u>CERTIFICATE OF SERVICE</u>**

I, Lawrence G. McMichael, Attorney for Respondent, hereby certify that I have served the foregoing *Motion to Limit the Subpoena* and *Memorandum in Support Thereof* upon the below Attorneys for Requestor via electronic mail on this day, July 8, 2025.

Brett Shumate, Assistant Attorney General -- Brett.a.shumate@usdoj.gov

Ross Goldstein – Ross.goldstein@usdoj.gov

Patrick Runkle – Patrick.r.runkle@usdoj.gov

Francisco Unger – Francisco.l.unger@usdoj.gov

Tiara Johnson – Tiara.a.johnson@usdoj.gov

Jordan Campbell – Jordan.c.campbell@usdoj.gov

/s/ *Lawrence G. McMichael*
Lawrence G. McMichael

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**IN RE: Administrative Subpoena No. 25-1431-014**

## ORDER

AND NOW, this _____ day of July, 2025, upon consideration of the Respondent's Motion to Limit Administrative Subpoena No. 25-1431-014, any response thereto, and argument thereupon, it is hereby **ORDERED** that Subpoena No. 25-1431-014 issued on June 12, 2025 is hereby **Limited** to exclude any and all other Requests enumerated in the Subpoena (Request 1 through Request 15) to the extent that such Requests or sub-Requests call for the production of health information of CHOP patients, including but not limited to Requests 11, 12, and 13.

**BY THE COURT:**

_____

Judge, United States District Court

# Exhibit A

# UNITED STATES OF AMERICA
# DEPARTMENT OF JUSTICE

## SUBPOENA DUCES TECUM

No. 25-1431-014

**To:**  The Children's Hospital of Philadelphia
3401 Civic Center Boulevard
Philadelphia, Pennsylvania 19104

*YOU ARE HEREBY COMMANDED TO APPEAR BEFORE Patrick Runkle, Ross Goldstein, and/or Francisco Unger, officials of the United States Department of Justice, and you are hereby required to bring with you and produce the following:*

Please see Attachment A

*which are necessary in the performance of the responsibility of the United States Department of Justice to investigate Federal health care offenses as defined in 18 U.S.C. § 24(a).*

*Please contact Assistant Director Patrick Runkle, Assistant Director Ross Goldstein, or Trial Attorney Francisco Unger at 202-616-0295 if you have any questions regarding this Subpoena Duces Tecum.*

### PLACE AND TIME FOR APPEARANCE:

U.S. Department of Justice, Consumer Protection Branch, 450 Fifth St., NW, Washington, D.C.
on Wednesday, the 9th day of July, 2025, at ten o'clock a.m.

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

Issued under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. § 3486)



*IN TESTIMONY WHEREOF*

Brett A. Shumate, Assistant Attorney General, the undersigned official of the United States Department of Justice, has set his hand this 11th day June, 2025.

BRETT
SHUMATE

Digitally signed by BRETT
SHUMATE
Date: 2025.06.11 12:05:50
-04'00'

*(signature)*

## ATTACHMENT A TO SUBPOENA TO:

THE CHILDREN'S HOSPITAL OF PHILADELPHIA
3401 CIVIC CENTER BOULEVARD
PHILADELPHIA, PENNSYLVANIA 19146-2305

## I. DEFINITIONS

1.  "You," "Your Company," "the Company," and "CHOP" means:

    a.  The Children's Hospital of Philadelphia, a Pennsylvania nonprofit corporation, whose principal place of business is located at 3401 Civic Center Boulevard, Philadelphia, Pennsylvania, without regard to any name under which it has done business;

    b.  All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including, without limitation, CHOP's Gender and Sexuality Development Program; and

    c.  Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2.  "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3.  "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

    a.  All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

1

b.   Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes, telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c.   Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d.   Any electronic files saved as a backup, including metadata;

e.   Any deleted but recoverable electronic files, including metadata;

f.   Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g.   Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h.   All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4.   "Relevant Time Period" means January 1, 2020, through the present date. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5.   "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6.   "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7.   "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

2

8. "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any records or logs reflecting the time, date, participants, and content of such communications.

9. "Gender-related care" means any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex.

10. "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (e.g., leuprolide, triptorelin) used to delay the onset of puberty.

11. "Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics.

12. "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. GENERAL INSTRUCTIONS

1. You are required to produce the **originals** of each document and other item that is responsive, in whole or in part, to any request set forth in this Subpoena, together with all copies of any such document that exist.

   a. If a copy is identical to the original, you are not required to produce it, but if you choose not to, your records custodian (the "Custodian," as described below) must maintain a written log identifying the location(s) where each identical copy of the original document was located, including all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers of where the document is located.

   b. If a copy differs from the original by virtue of any addition, deletion, alteration, notation, or inscription on any part of the front or back of the document, the original and copy must each be produced.

3

2.    **No document called for by this subpoena shall be destroyed, modified, redacted, removed, or otherwise made inaccessible.** Documents called for by this Subpoena for which a claim of privilege is made, in compliance with the instruction below, shall be retained and protected.

3.    Your Company is to designate someone as the person responsible to produce documents on the Subpoena return date (the "Custodian").

   a.    Such Custodian shall have personal, direct, and thorough knowledge of, and responsibility for, the search conducted by the Company for documents responsive to this Subpoena.

   b.    The Custodian shall be prepared on the return date to submit to examination concerning the method and completeness of the Company's response, the exact location(s) within the Company's premises at which documents produced in response to the Subpoena were found, and other matters pertaining to the search.

   c.    The Custodian shall further be prepared to provide a written log identifying the location(s) in which each produced document was located, indicating all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers, of where the document is located.

4.    The Company shall identify the paragraph and subparagraph of Section III of this Attachment to the Subpoena ("Documents to Be Produced") to which each document produced pursuant to this Subpoena is responsive.

5.    If the Company has knowledge of any document that would be responsive to this Subpoena, but has been lost, destroyed, or discarded, it shall identify the document to the extent possible, and provide an explanation of the loss, destruction or discarding, including identification of each person authorizing or having knowledge of the loss, destruction, or discarding.

6.    The singular form of a word shall be construed to include within its meaning the plural form of the word, and *vice versa*, and the use of any tense of any verb shall be considered to include all other tenses in a manner that gives this Subpoena the broadest reading.

7.    All electronically stored information must be collected using a forensically sound process. When the image file is produced, the Company must preserve the integrity of the electronic document's contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

4

8.  If the Company withholds any document on the ground of any claimed privilege, it shall provide a statement with respect to each document setting forth

a.  The name and title of the author (and if different, the preparer and signatory);

b.  The name(s) and title(s) of the individual(s) to whom the document was addressed;

c.  The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

d.  The date of the document;

e.  The number of pages;

f.  A brief description of the subject matter;

g.  A statement of the specific basis on which privilege is claimed; and

h.  The paragraph or subparagraph in Section III of this Attachment ("Documents to Be Produced") to which it is responsive.

## III. DOCUMENTS TO BE PRODUCED

1.  Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories: (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities.

2.  All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care.

3.  All documents that show or relate to any use of diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, medication management, etc.).

All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes.

5.  All communications with public or private health care benefit programs or plans regarding the use of ICD codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care.

6.  Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy.

7.  All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors.

8.  All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

9.  All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

10. All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

11. Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12. For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.*, uses not

6

approved by the United States Food and Drug Administration) and potential risks.

14. All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety of puberty blockers or hormones used in the treatment of minor patients.

15. All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.

## IV. FORM OF PRODUCTION

Documents responsive to this Subpoena should be produced in the format specified in the "Production Specifications," attached as ATTACHMENT B to this Subpoena.

Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")

## Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

### 1. Specification Modifications

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form. Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

### 2. Production Format of ESI and Imaged Hard Copy Documents

Responsive ESI shall be produced in its unprocessed form (i.e., in its native format), without altering native electronic file formats and maintains the integrity of all source, custodian, application, embedded and metadata related thereto. The native electronic file formats provided shall be of a type and nature which is functionally useable by all parties. No alteration shall be made to file names or extensions for responsive native electronic files. If a producing party is converting native files to image files for its own purposes, the Government requests a copy of that image file along with production of the native file.

For ESI, a producing party may provide an image file without a native file only if the affected document requires a privilege redaction or other permitted redaction.. Except as outlined below in sections 5 – 21, the redacted document shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. Paper documents shall also be imaged pursuant to the requirements below.

All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

   a. **Image File Format:** All imaged documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

   b. When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT

Group IV (2D Compression). When producing in *color*, paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

  i. All TIFF file names shall include the unique Bates number burned into the image. (See section 22, below, regarding Bates number instructions.)
  ii. All TIFF image files shall be stored with the ".tif" extension.
  iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.
      1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.
  iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.
  v. No image folder shall contain more than 2,000 images.

c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

```
REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,,
```

The fields are, from left to right:

  - Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
  - Field Two – (blank) – the volume identifier. This field is not required.
  - Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
  - Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
  - Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.

- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

    1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | ¶ or Code 020 |
| *Text Qualifier* | þ or Code 254 |
| *Newline* | ® or Code 174 |
| *Multi-value* | ; or Code 059 |
| *Nested values* | \ or Code 092 |

    2. This load file should contain the relative file path to the individual multi-page, document level text files.
    3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
    4. There should be one line for every record in a collection.
    5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

       þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:

    \\*CaseName*\\**LoadFiles**
    \\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
    \\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
    \\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)

\CaseName\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder) \CaseName\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

### 3.    Required Metadata/Database Fields

A "√" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | √ | √ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other. If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.: e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/YY YY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YY YY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YY YY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YY YY HH:MM:SS | | ✓ | ✓ |
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YY YY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YY YY HH:MM:SS | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YY YY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |

7

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

#### 4. Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures

a. De-duplication of exact hash copies shall only be permitted if the producing party can meet all the provisions of this section. If a producing party cannot comply with any requirement of this section, it shall not conduct de-duplication of exact hash copies.

b. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

c. All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

d. All files should be globally de-duplicated with the following conditions:

i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

iv. No customization of hashing may occur without prior express approval by the Government.

v. De-duplication must be done by document family, not by individual document.

vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

e. The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

### 5. Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

### 6. Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

9

### 7. Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8. Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

  a. The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.
  b. If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9. Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

  a. Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
  b. The first document in the collection represents the parent document and all other documents will represent the children.
  c. All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
  d. All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10. Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below.

The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11.    Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12.    Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

11

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication ; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format. The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production. The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#. The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

- a. AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
- b. GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

16

c. Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|        | *Document #1*          | *Document #2*          |
|--------|------------------------|------------------------|
| *Page #1* | PREFIX00000000001      | PREFIX00000000002      |
| *Page #2* | PREFIX00000000001.002  | PREFIX00000000002.002  |
| *Page #3* | PREFIX00000000001.003  | PREFIX00000000002.003  |

## 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

a. CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
b. External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
c. Government approved File Transfer Protocol (FTP) technologies.
d. Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
e. Media should be labeled with the case name, production date, Bates range, and producing party.

## 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

### 25.    Privilege Logs

a.      The name and title of the author (and if different, the preparer and signatory);

b.      The name(s) and title(s) of the individual(s) to whom the document was addressed;

c.      The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

d.      The date of the document;

e.      The number of pages;

f.      A brief description of the subject matter;

g.      A statement of the specific basis on which privilege is claimed; and

h.      The paragraph or subparagraph of the Subpoena to which it is responsive.

### 26.    Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 27.    Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 28.    Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 29.    Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

# Exhibit B

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re Administrative Subpoena 25-1431-014 | Case No. [Case Number] |
| | Assigned To The Honorable For All Purposes: [Judge (Assigned to…)] |
| | **JOINT DECLARATION OF NADIA DOWSHEN, M.D., AND LINDA HAWKINS, PH.D., IN SUPPORT OF MOTION TO LIMIT ADMINISTRATIVE SUBPOENA** |
| | Date Action Filed:    July 8, 2025 |

We, the undersigned, jointly declare as follows:

We make this declaration based on professional knowledge and experience and a review of the administrative subpoena issued by the U.S. Department of Justice ("DOJ") to the Children's Hospital of Philadelphia ("CHOP") on June 12, 2025 (the "Subpoena"). If called as witnesses, we could and would competently testify to the following.

**A. Background**

1.    I, Linda A. Hawkins, am a Licensed Professional Counselor with an MSEd in Psychological Services from the University of Pennsylvania and a Ph.D in Human Development and Human Sexuality specializing in working with children and adolescents experiencing gender dysphoria and their families.

2.    I, Nadia Dowshen, M.D., MSHP, am a board-certified pediatrician and adolescent medicine specialist in the Craig-Dalsimer Division of Adolescent Medicine at CHOP. I am the Director of Adolescent HIV Services and the Medical Director of the Gender and Sexuality Development Program at CHOP. I am a clinician scientist and faculty member of CHOP's PolicyLab. I am an Associate Professor of Pediatrics at the Perelman School of Medicine at the University of Pennsylvania.

3.    Together, we are the Co-Founders and Co-Directors of the Gender & Sexuality Development Program (the "Program") at CHOP where we oversee the care of families between two

Joint Declaration of Nadia Dowshen, M.D., and Linda Hawkins, Ph.D.

clinics in Philadelphia, Pennsylvania and Voorhees, New Jersey. We also support CHOP's competencies in care and practice for LGBTQ+ patients, guests, families and staff throughout the hospital network.

**B. The Program's Assessment and Treatment Practices**

4.    Families are at the center of all decision-making related to the care delivered to patients of the Program. All families connecting to the Program begin with an assessment conducted by a licensed mental health provider. The minor patient and the parent(s)/legal guardian(s) then have a series of appointments with a licensed mental health specialist specifically trained in child and adolescent development.

5.    Assessment appointments are completed with both the patient and parent(s)/legal guardian(s) to understand the patient's history of gender expression and identity.

6.    If a diagnosis of gender dysphoria is being considered, the assessment process will include a comprehensive psychosocial evaluation of the patient, as well as an evaluation of the patient's cognitive abilities, executive function skills, communication skills, emotional functioning, self-awareness/social cognition, and capacity for decision-making.

7.    Any and all care plans/recommendations are determined based on the diagnostic outcome of the assessment process and are dependent on the patient's age, development, and the particular needs of the patient and the family.

8.    After the assessment process, if the patient is diagnosed with gender dysphoria and the patient family and multidisciplinary care team agree that treatment is appropriate, the patient, the family, and the care team proceed with the agreed-upon plan of care.

9.    Consistent with the shared decision-making model, prior to any medical treatment being administered, a CHOP physician and mental health provider discuss the patient's needs, the recommended treatment, treatment risks, benefits, and alternatives, and any concerns or other issues with the parent(s)/legal guardian(s) and the patient.

10.    Medical treatments proceed only after informed consent is obtained from parent(s)/legal guardian(s) with medical decision-making authority over the minor patient and the minor patient provides their assent to care.

C.  **The Impact of the Subpoena on Current, Former, and Prospective Program Patients**

11.    DOJ's demand for personal health information of current and former Program patients would have a profoundly detrimental impact on Program patients and their families.

12.    Patients who seek care from the Program are typically experiencing complicated, deeply personal discomfort related to their gender.  Many are victims of discrimination in their communities. Accordingly, patients view the Program as a safe space to share their experience without fear of repercussions.  While patients are informed that there are circumstances in which their medical records can be disclosed, they would not anticipate a sweeping request from federal prosecutors for their most sensitive health information simply because they sought treatment through the Program.  Disclosure of medical records in this manner will compromise the integrity of the safe space the Program has become for patients and families.

13.    Losing that safe space is costly, particularly in light of the environment patients and families are experiencing today, where prominent government officials are loudly expressing their opposition to medical treatment for gender dysphoria for minors.  In light of that environment, patients of the Program harbor substantial fears that they are being surveilled or targeted for exposure by opponents of the treatment.  Patients and their parents have expressed grave concern with their rights to confidential patient-provider healthcare information being made public, even to investigatory bodies. They have identified that this fear will deter them from participating in the activities that are hallmarks of a happy childhood—school, clubs and other extracurricular activities—out of concern that they will be singled out for being transgender.  The Program is a place where they can engage with others and be their true selves.  The mere fact that DOJ has requested detailed information about the treatment they

received through the Program will exacerbate patients' fears of being targeted, potentially leading them to further withdraw from public spaces and compromising their ability to live rich, full lives.

14.    If CHOP is forced to comply with the Subpoena, it is reasonable to expect that the disclosure of records will prove traumatic for Program patients. As previously explained, when a diagnosis of gender dysphoria is being considered, the Program will conduct a comprehensive psychosocial evaluation of the patient. This evaluation typically involves patients sharing intimate and extremely sensitive personal details, often touching on such subjects as discomfort with specific body parts, sexual history, past trauma, interfamilial dynamics, use of self-harm or other negative coping mechanisms that may risk their health and well-being such as disordered eating, and experiences of harassment and bullying. Knowing that prosecutors and investigators would become privy to that information, and possibly made available to the public, will be experienced by patients and their parents as a tremendous violation of their privacy by their healthcare providers, by CHOP, and by healthcare facilities in general.

15.    If, beyond receiving the information responsive to the Subpoena, federal prosecutors and investigators use that information to identify and approach patients to interview them about the care they received, the negative effects would be significantly amplified. Many Program patients are extremely reticent to discuss their experience with gender dysphoria with anyone outside of their family and clinical team, much less federal law enforcement officials. The prospect of being interviewed by federal agents and prosecutors, particularly in light of DOJ's publicly professed opposition to medical treatment for minor patients suffering from gender dysphoria, would be extremely distressing.

16.    Other problems could be expected to flow from those interactions as well. For example, many patients of the Program view the medical care they receive to treat their gender dysphoria as a lifeline. Being questioned about that care and made to feel that their statements could call into question the actions of parents and guardians who supported them, and the healthcare providers who treated them;

could cause feelings of guilt and fear that would be very damaging to their mental health; and could even result in thoughts of, or completed, suicide.

17.    In addition, some patients of the Program live as the gender with which they identify and may be selective with whom they choose to share their prior experience with gender dysphoria.  For those patients, being approached by investigators to discuss their treatment could effectively "out" them as transgender, thus taking the critical and highly personal decision to share that aspect of their lives out of their hands.  Unfortunately, being identified as transgender could also expose patients to an increased risk of harassment, discrimination, and violence.

18.    In the event that records produced in response to the Subpoena were somehow made public, we expect patients would experience additional significant harm.  As these records contain deeply personal details about gender dysphoria, sexual histories, interpersonal relationships, and mental health, patients could experience embarrassment, humiliation, and trauma from knowing they were publicly accessible.

19.    Because the information called for by the Subpoena would encompass records that could include discussion of patients' parents, siblings, friends, teachers, coaches and others, the potential for exposure of sensitive details, embarrassment, humiliation, and trauma extends to those who have little or no connection to the Program and no idea that information concerning them is at issue.

20.    In addition to those immediate impacts, it is reasonable to expect that disclosure in response to the Subpoena would have the longer-term effect of chilling patients' willingness to seek medical care in the Program, at CHOP in general, and with other healthcare providers.  In our experience, patients of the Program are often already reticent to engage with healthcare providers because many have had negative experiences as a result of anti-transgender bias.  The chilling effect caused by disclosure of patient records could extend beyond treatment through the Program to other aspects of medical care, such as mental health treatment, preventative care, emergency care, and other subspecialty care, thereby impeding patients' ability to live long, healthy lives.

21.     Even if patients remain willing to engage with healthcare providers after a disclosure in response to the Subpoena, they may be less candid in their communications, which would compromise opportunities for effective treatment.

22.     For all of those reasons, we believe disclosure of the information called for by the Subpoena threatens significant harm to our patients and their families.

We declare under penalty of perjury that the foregoing is true and correct.

DATED: July 8, 2025

By:

# Exhibit C

UNITED STATES DISTRICT COURT
Eastern District of Pennsylvania

In re Administrative Subpoena 25-1431-014

Case No. [Case Number]

Assigned To The Honorable  For All Purposes: [Judge (Assigned to…)]

**DECLARATION OF JOSEPH ST. GEME III, M.D., IN SUPPORT OF MOTION TO LIMIT ADMINISTRATIVE SUBPOENA**

Date Action Filed:   July 8, 2025

I, Dr. Joseph St. Geme III, declare as follows:

I make this declaration based on professional knowledge and experience and a review of the administrative subpoena issued by the U.S. Department of Justice ("DOJ") to the Children's Hospital of Philadelphia on June 12, 2025 (the "Subpoena").   If called as a witness, I would competently testify to the following.

A.  **Background**

1.      I, Dr. Joseph St. Geme III, am the Physician-in-Chief and Chair of the Department of Pediatrics at the Children's Hospital of Philadelphia.   I have held my current position as Physician-in-Chief and Chair since 2013.  I serve as the President of Medical Staff of the Children's Hospital of Philadelphia and President of the Children's Hospital of Philadelphia Practice Association.

2.      I concurrently serve as the Chair of the Department of Pediatrics and as the Leonard and Madlyn Abramson Professor of Pediatrics and Microbiology at the Perelman School of Medicine at the University of Pennsylvania.

3.      I hold a bachelor's degree from Stanford University and a medical degree from Harvard Medical School.   I completed a pediatric residency and chief residency at Children's Hospital of Philadelphia.  I pursued postdoctoral training in microbiology, immunology, and infectious diseases at Stanford University.

Declaration of Joseph St. Geme III, M.D.

4.     I have been elected to the Society for Pediatric Research, the American Pediatric Society, the American Society for Clinical Investigation, the Association of American Physicians, the American Academy of Microbiology, the American Association for the Advancement of Science, and the National Academy of Medicine.

5.     In my role as Physician-in-Chief and Chair of the Department of Pediatrics at the Children's Hospital of Philadelphia, I work closely with colleagues across the enterprise to ensure that Children's Hospital remains a world leader in pediatric clinical care, research, and education.  I have oversight over all divisions within the Department of Pediatrics, including, but not limited to, Adolescent Medicine, Developmental and Behavioral Pediatrics, Emergency Medicine, Endocrinology and Diabetes, General Pediatrics, Human Genetics, and Neurology.

**C.**  **The Impact of the Subpoena on Current, Former, and Prospective Children's Hospital Patients**

6.     DOJ's demand for personal health information of current and former patients of the Children's Hospital of Philadelphia's Gender & Sexuality Development Program (the "Program") will have detrimental effects that impact the Children's Hospital of Philadelphia's entire clinical population, members of their families, and the broader community.

7.     The patient-provider relationship is fundamental to people living healthy, productive lives.  Confidentiality is central to that relationship, as patients often assume that, in general, sensitive personal information they share with their providers will not be disclosed further.  Although patients and their families may understand that insurance companies and government agencies may be able to access their records to some degree, they do not expect that federal prosecutors and investigators will have unfettered access to their most sensitive health information simply because of the condition for which they sought medical care, and the treatment they received.

8.     It is reasonable to expect that, if patients and families became aware of DOJ's Subpoena, they would be more hesitant to seek medical care, resulting in fewer patients accessing necessary medical

treatment. Just as importantly, those that do seek treatment may be reluctant to disclose particularly sensitive personal information out of fear of similar government requests, making it more difficult for medical providers to accurately diagnose and provide effective care to their patients.

9.    Critically, the potential harms associated with DOJ's Subpoena would not be limited to patients of the Program. Compliance with the Subpoena would set a precedent that a federal law enforcement agency can seek and obtain sensitive health information of anyone based on its skepticism about a particular form of medical treatment. For that reason, the chilling effect described above would not be limited to the patient population most directly impacted by the Subpoena.

10.    Rather, it is reasonable to expect that other patient populations would also be chilled in their interactions with healthcare providers. For example, patients who have sensitive and complex medical histories and diagnoses, such as those being treated for substance abuse, behavioral and mental health conditions, or sexually transmitted infections, and those experiencing challenges at home. If patients fear that private and sensitive information is subject to collection and review by federal law enforcement, and outreach from federal law enforcement, it is reasonable to expect that they will be less likely to pursue necessary medical treatment, or to be candid with their medical providers.

11.    In addition, with medical treatment often the subject of intense debate, patients and families are often concerned about disclosure of sensitive information related to patients diagnosed with or treated for conditions that are the subject of scrutiny. The existence of the DOJ's Subpoena would exacerbate those types of fears to the detriment of the patients and families concerned about the government's focus on conditions affecting their children.

12.    Trust is a vital part of an effective physician-patient relationship, especially in pediatric care where hospital visits are frequently associated with painful procedures or traumatic life events. Trust between a physician and patient family allows for open and honest discussion of medical conditions, questions and concerns, and treatment recommendations. This is particularly important for adolescent patients. When patient families believe sensitive health information of their child may be

3

shared in undesired ways, trust is undermined and effective discussions about medical care are more challenging. Additionally, pediatric patients who have had their trust in the medical profession compromised in this manner may delay or forgo necessary medical care, compromising their long-term health outcomes.

13. For all these reasons, I believe disclosure of the information called for by the Subpoena threatens significant harm to our patients, their families, and the broader community.

4

1     I declare under penalty of perjury that the foregoing is true and correct.

2    DATED: July 8, 2025

3                                  By: _____

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5