UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ADMINISTRATIVE SUBPOENA NO. 25-1431-014 | MISCELLANEOUS ACTION<br>NO. 25-MC-0039-MAK |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO CHILDREN'S HOSPITAL OF PHILADELPHIA'S MOTION TO MODIFY**

While the Government recognizes this investigation concerns potential misconduct undertaken in the context of a politically sensitive subject matter, that fact does not in any way make the subpoena's request for patient records—to which the Children's Hospital of Philadelphia ("CHOP") specifically objects—invalid or unenforceable. Because the statute that authorizes the administrative subpoenas in this case already strikes an appropriate privacy balance, CHOP's objections to producing patient records are meritless.

**BACKGROUND**

The Government is conducting an investigation into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the Food, Drug, and Cosmetic Act ("FDCA"). Because public or private insurance plans were presented with claims related to off-label use of these medications, such a violation of the FDCA could constitute a "federal health care offense" as defined by 18 U.S.C. § 24.

CHOP acknowledges that it provides gender-related medical care to minors, including the use of puberty blockers and cross-sex hormones that are one of the foci of the investigation. CHOP Memorandum ("Memo.") at 5-6. Puberty blockers are administered off-label for treating

gender dysphoria, and they are not authorized by FDA for that use. *United States v. Skrmetti*, 605 U.S. __, 145 S. Ct. 1816, 1841 (June 18, 2025) (Thomas, J., concurring).

The instant subpoena to CHOP was duly issued on June 13, 2025, and was served on counsel for CHOP. The return date specified in the subpoena was set as July 9, 2025. CHOP has stated that it will comply with the other requests in the subpoena, but has refused to comply with the requests for patient information.

**ARGUMENT**

Respectfully, the Court should deny CHOP's request to avoid compliance with the Government's subpoena. HIPAA authorized the Government to send HIPAA subpoenas in exactly this type of investigation and to obtain exactly the type of information this subpoena requests. CHOP's arguments to the contrary are either based on inapplicable law or reflect a fundamental misunderstanding of the interests at stake.

**I.     THE *WESTINGHOUSE* TEST DOES NOT APPLY TO THIS SUBPOENA.**

CHOP's entire privacy argument rests exclusively on a novel application of *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, a 1980 Third Circuit decision. In that matter, the National Institute for Occupational Safety and Health ("NIOSH") issued a subpoena under its statute for medical records of Westinghouse employees whom NIOSH believed had been exposed to a dangerous substance. Westinghouse resisted the subpoena, and the Third Circuit conditionally ordered the records produced, fashioning a non-statutory seven-factor test not found in any Supreme Court precedent or prior decision. *Id.* at 579. The Court also fashioned a complex, non-statutory notice-and-response remedy as to medical records of individual employees not involved in the litigation. *Id.* at 581–82.

But the *Westinghouse* test does not apply to HIPAA subpoenas. Indeed, CHOP does not cite a single case applying the *Westinghouse* factors to a HIPAA subpoena, because it cannot, as

there is no case in this circuit or elsewhere applying *Westinghouse* to a HIPAA subpoena.[1] *Westinghouse* is simply inapposite, for two independent reasons: First, the HIPAA statute—and the HIPAA subpoenas it created—superseded the *Westinghouse* test by addressing the concerns about medical privacy that animated the *Westinghouse* decision; and second, *Westinghouse* was wrongly decided.

    **A. The *Westinghouse* Test Does Not Apply to Medical Records Sought Via HIPAA Subpoena.**

The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") "is the primary federal law which was passed to ensure an individual's right to privacy over medical records." *United States v. Elliott*, 676 F. Supp. 2d. 431, 436 (D. Md. 2009). Congress created the type of administrative subpoena at issue here as part of HIPAA. Because HIPAA and HIPAA subpoenas did not exist in 1980, the issue of whether a HIPAA subpoena is subject to the *Westinghouse* test could not have been, and was not, decided by *Westinghouse*.

HIPAA sets forth a small number of basic procedural requirements for a HIPAA subpoena to be valid, and CHOP apparently believes those requirements are met here because it has agreed to produce non-patient-specific documents. 18 U.S.C. § 3486(a). Conspicuously absent from the statutory requirements for a HIPAA subpoena, however, is the seven-factor balancing test from *Westinghouse*. "If the text [of a statute] is clear and unambiguous, this Court must simply apply it." *In re KB Toys Inc.*, 736 F.3d 247, 251 (3d Cir. 2013). This Court should therefore hold that HIPAA subpoenas are not subject to the *Westinghouse* test.

---

[1] In fact, the only case the Government is aware of in this circuit discussing a HIPAA subpoena makes no mention at all of *Westinghouse*, instead citing and quoting from the Sixth Circuit's decision in *Doe v. United States*, 253 F.3d 256 (6th Cir. 2001)—in which the Sixth Circuit affirmed the denial of a motion to quash a HIPAA subpoena—to explain that "it appears clear, both from the language of the statute and from Congress's intent in enacting HIPAA, that the DOJ's subpoena power in investigating federal health care offenses is meant to be broad" and that Section 3486's language "illustrat[es] the substantial scope of the subpoena power Congress intended to give the Attorney General." *United States v. Hertel & Brown Physical & Aquatic Therapy*, No. 1:21-CR-39, 2025 WL 83789, at *7 (W.D. Pa. Jan. 13, 2025).

By passing HIPAA in 1996, Congress directly addressed the privacy concerns that animated *Westinghouse* by generally prohibiting the disclosure of protected health information by covered entities. "Through HIPAA, Congress has spoken about the protection that must be extended to patients regarding their health related information." *Wade v. Vabnick-Wener*, 922 F. Supp. 2d 679, 685 (W.D. Tenn. 2010). And in that same law, Congress in essence abrogated the *Westinghouse* test for HIPAA subpoenas by giving the Department of Justice a specific, Constitutionally-compliant subpoena power to obtain the very medical records that are protected by the HIPAA statute. Congress had medical privacy at the forefront of its mind, but it obviously did not believe that the *Westinghouse* factors—or anything like them—were warranted for HIPAA subpoenas or necessary to protect patient privacy. Put differently, a HIPPA subpoena that meets the statutory requirements for enforcement satisfy the *Westinghouse* test (and the Constitution's privacy guarantees) as a matter of law; no further balancing is required.

The only circuit courts to have considered HIPAA subpoenas have upheld them over Constitutional challenges that attempt to place privacy-based, *Westinghouse*-like additional restrictions on their use. *In re Subpoena Duces Tecum*, 228 F.3d 341, 350 (4th Cir. 2000) ("[W]e reject [the subpoena recipient's] implied argument that the subpoena power as defined by 18 U.S.C. § 3486 is constitutionally unreasonable."); *Doe v. United States*, 253 F.3d 256, 264–65 (6th Cir. 2001) ("We agree with the Fourth Circuit that the reasonable relevance test should apply to [HIPAA] subpoenas."); *United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 817 (8th Cir. 2012).

This is because, among other reasons, the Government's "compelling interest in identifying illegal activity and in deterring future misconduct" using a § 3486 subpoena outweighs Constitutional privacy concerns as a matter of law; the disclosure to the government of patient records is not "meaningfully distinguishable from a host of other unpleasant invasions of

privacy that are associated with many facets of health care." *In re Subpoena Duces Tecum*, 228 F.3d at 351. Furthermore, as these courts have also determined, HIPAA already provides Constitutionally reasonable privacy protection for patient information obtained via HIPAA subpoenas. *Id*. ("[The government's] interest outweighs the privacy rights of those whose records were turned over to the government, particularly in light of the limitation placed on uses of subpoenaed information by § 3486.").

Because the *Westinghouse* test does not apply, and because CHOP does not identify another source of law to resist complying with the Government's subpoena, this Court should deny CHOP's motion and order it to produce the requested documents.

### B. *Westinghouse* Was Wrongly Decided.

The Government recognizes that *Westinghouse* is a precedential decision of the Third Circuit, but wishes to preserve the argument that the case was wrongly decided should this Court decide that *Westinghouse* does apply in this context. Among other things, as described above, *Westinghouse* identified no actual basis in the statute or Supreme Court case law for the rule it articulated, erecting extra-statutory barriers to the enforcement of valid administrative subpoenas—as CHOP casually admits in its filing. *See* CHOP Memo. at 9 ("Even where a subpoena satisfies the criteria for judicial enforcement, a court must consider seven factors in determining whether an intrusion into an individual's privacy is justified.").

To the extent that *Westinghouse* purported to base its holding on an amorphous Constitutional right to the privacy of medical records, even the *Westinghouse* court recognized that the contours of such a right were unclear. 638 F.2d at 577. The Government is highly skeptical that an affirmative, free-floating right to control the disclosure of medical records in whatever context they may be found exists under current Constitutional jurisprudence, given the lack of historical grounding for such a right. *See Washington v. Glucksberg*, 521 U.S. 702, 722

(1997). The Government is also highly skeptical that CHOP has standing to raise a Fourth Amendment challenge to this subpoena on behalf of all its patients—perhaps this is why CHOP does not directly raise such a challenge, but only raises it indirectly through *Westinghouse*. *United States v. Miller*, 425 U.S. 435, 443 (1976) ("[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.").

For these reasons, among others, the other circuits that have considered privacy-based challenges to administrative subpoenas have rejected such additional requirements. *In re Subpoena Duces Tecum*, 228 F.3d at 350; *Doe*, 253 F.3d at 264–65; *Whispering Oaks Residential Care Facility*, 673 F.3d at 817.

## II. IN THE ALTERNATIVE, THE GOVERNMENT MEETS THE *WESTINGHOUSE* TEST.

The Court should also overrule CHOP's objections even if the *Westinghouse* test applies. The seven *Westinghouse* factors are: (1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest favoring access. *Doe v. SEPTA*, 72 F.3d 1133, 1140 (3d Cir. 1995).

### A. "[T]he degree of need for access" (factor 6) and "whether there is an express statutory mandate" (factor 7) are essentially dispositive and strongly favor the Government.

Although CHOP acknowledges that factors 6 and 7 favor the Government, Memo. at 20-21 (putting these factors "on the other side of the ledger"), it gives short shrift to the proper interpretation and weight of these factors compared to the others. First, as to the government's

-6-

need for this information, the acts being investigated here are, at base, statutory violations commonly investigated by the Government in many contexts over many decades—such as violations of the Federal Food, Drug, and Cosmetic Act affecting the safety of the Nation's pharmaceutical supply, *see United States v. Dotterweich*, 320 U.S. 277, 280 (1943), and fraudulent practices in the healthcare system, *see Harkonen v. Sebelius*, No. C 13-0071 PJH, 2013 WL 5734918, at *16 (N.D. Cal. Oct. 22, 2013) (noting "the [G]overnment's interests in deterring fraud in the delivery of health care and health care items and services, and in protecting federal health care programs and their beneficiaries from individuals who have behaved in an untrustworthy manner"). The document requests here are common in such investigations, and CHOP does not really argue otherwise.

Next, as to CHOP's suggestion that the Government should settle for what CHOP is willing to provide, Memo. at 20, subpoena recipients do not typically get to choose what types of evidence the Government gets in its investigations. *In re Grand Jury*, 103 F.3d 1140, 1149 (3d Cir. 1997) ("the public has a right to every man's evidence"). CHOP does not offer the Court a compelling reason for the Court to authorize such an endeavor here. And the amount of secrecy in this area makes it difficult or impossible for the Government to investigate the on-the-ground provision of these services without obtaining the requested records.[2]

Finally, the Government's need under factor 6 is extremely heightened in this area, because—as discussed *supra* at 7–8—the investigation relates to potential misconduct committed against vulnerable children, leaving lifelong mental and physical side effects and consequences.

---

[2] For example, in denying an effort by WPATH, whose guidelines CHOP uses, to keep records of its guidelines' development from being publicly released, the Middle District of Alabama observed that WPATH "touts its guidelines and standards of care for treating transgender children as the product of rigorous science and broad consensus. Given this wide acceptance of what WPATH claims to be reliable evidence, one would think it would be willing and eager to demonstrate as much. It is not." *Boe v. Marshall*, 22-cv-184 (M.D. Ala.), (ECF No, 754, *Memorandum Opinion and Order Granting Time Sensitive Motion for Relief*, June 9, 2025.).

*See New York v. Ferber*, 458 U.S. 747, 756 (1982) ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling."); *In re Subpoena Duces Tecum*, 228 F.3d at 351 ("The government has a compelling interest in identifying illegal activity and in deterring future misconduct.").

In these circumstances, therefore, factor 6 is essentially dispositive. The Government's compelling interest in investigating health care offenses involving minors outweighs, as a matter of law, an individual's privacy interest in medical records. The Constitution cannot reasonably be interpreted to divest the Government of its ability to protect children and combat offenses committed against them.

Finally, even CHOP admits that factor 7 significantly favors the Government, because the statute "affords DOJ latitude," Memo. at 20, to undertake this investigation.[3] And that is an understatement. Congress enacted an express statutory mandate in HIPPA for DOJ to investigate the sort of offenses under investigation here—a mandate that "ranks with the other public interests which have been found to justify intrusion into records and information normally considered private." *Westinghouse*, 638 F.2d at 579.

### B. "[T]he adequacy of safeguards to prevent unauthorized disclosure" also favors the Government.

As to factor 5, the circuit courts to have considered the privacy protections in the HIPAA subpoena statute have found them adequate to protect patient privacy. *In re Subpoena Duces Tecum*, 228 F.3d at 350; *Doe*, 253 F.3d at 264–65; *Whispering Oaks Residential Care Facility*, 673 F.3d at 817. Specifically, the statute requires the government to return records if the investigation does not ripen into an enforcement action. 18 U.S.C. § 3486(a)(8). More relevant to

---

[3] CHOP mentions a vacated HHS regulation about reproductive healthcare in its footnote 15. It is unclear how a vacated regulation on what on its face appears to be a different subject matter assists CHOP in its motion.

-8-

CHOP's objections, the statute broadly prohibits the government from using or disclosing "health information about an individual" that is obtained via this subpoena, and it further generally prohibits the government from using protected health information about a patient against that patient. 18 U.S.C. § 3486(e).

CHOP misunderstands this factor by citing theoretical ways in which records obtained via HIPAA subpoena could be shared with, for example, state law-enforcement agencies under existing law. Memo. at 18. Factor 5, however, is focused only on "unauthorized disclosure," and disclosures permitted under the laws at issue would not be unauthorized. CHOP also cites statements of Executive Branch officials about disclosures of unrelated documents in other, unrelated investigations and subject matters to suggest that somehow patient records, in violation of the statute, will be leaked by unknown Government actors. *Id*. at 18–19. None of the statements CHOP cites even remotely indicate that the Government will not follow the HIPAA statute in this matter. *See United States v. Martinez*, 103 F. Supp. 3d 675, 678 (E.D. Pa. 2015) (collecting cases on judicial presumption that Executive Branch officials have "properly discharged their official duties").

Furthermore, CHOP does not consider other obvious ways that the records could be further protected, such as a protective order, a letter agreement with the Government, or an order placing the records under seal. In sum, this factor weighs in favor of production.

### C. "The type of record requested," "the information it does or might contain," and the "potential for harm in any subsequent nonconsensual disclosure" are outweighed by the need for the information.

The Government is skeptical that factors 1, 2, and 3 should be weighed as three separate factors. In this matter, as will almost always be the case, the three factors are essentially identical: the HIPAA subpoena requests sensitive health information about children, gender, and

sexuality (factor 1), the records do in fact likely contain sensitive information (factor 2), and—because the information is sensitive—disclosures could cause embarrassment or harm (factor 3).

The Government does not quibble with the sensitivity of the patient information involved in this subpoena. The disagreement is rather with CHOP's characterization and balancing of these three factors, which CHOP seems to believe are all but dispositive because of the controversies surrounding gender-related care for minors. But CHOP's lengthy and repeated invocations about the sensitivity of this information prove too much.

CHOP chooses to bankroll and run a specialty clinic that provides controversial pharmaceutical and surgical care for minors, and it is unclear how CHOP believes the Government can investigate violations of federal law in the context of "sensitive" areas of medicine—which are plentiful—without having the *Westinghouse* factors weighing strongly against it at the outset. The Government cannot investigate, for example, the provision of pharmaceuticals to minors without obtaining records of pharmaceuticals provided to minors.

Indeed, CHOP seems to believe that if a provider operates in a "sensitive" area of medicine, that medical provider should also operate in a zone of impunity where the Government is unable to subpoena the actual records of treatment of patients. That is plainly not the law: Plaintiffs can cite no constitutional provision, statute, or even case categorically exempting sensitive medical practices broadly from investigation. Indeed, those are precisely the sort of practices that are most likely to merit investigation.

Contrary to CHOP's suggestions, in this investigation, the sensitivity of the records actually militates in favor of disclosure, not against it—because the consequences to children of unlawful practices in gender-related care practices are potentially so severe. Justice Thomas' recent concurrence in *Skrmetti* lays out numerous concerning pieces of evidence suggesting that gender-related care for minors in the United States is rife with potential consumer-protection

violations: false statements made to induce patient and parental consent to off-label drug use and other life-altering procedures; powerful pharmaceuticals casually being given off-label to very young minors, causing lifelong side effects; purported treatment guidelines based on false or insufficient evidence; and other alarming trends that the Executive Branch could reasonably believe deserve exploration. *Skrmetti*, 145 S. Ct. at 1845-49.

Although CHOP tells the Court in a declaration that everything is fine at its clinic, the entire point of conducting an investigation is that the Government need not take CHOP's word that it is not violating federal law, and may use the subpoena power that Congress gave the Attorney General to determine the veracity of CHOP's representations. *United States v. Oncology Servs. Corp.*, 60 F.3d 1015, 1019 (3d Cir. 1995) (*citing United States v. Morton Salt Co.*, 338 U.S. 632, 643 (1950)) ("When investigative duties are delegated by statute to an agency, it may take steps to inform itself as to whether there is a probable violation of the law."). In sum, CHOP's showing on the first three *Westinghouse* factors is entirely outweighed by the need for the records and the Government's interest in preventing potential lifelong consequences to children. Furthermore, the Government is willing to work with CHOP to minimize the impact on vulnerable patients, such as by accepting anonymized records as a first pass with the potential for obtaining more information on specific records should the need arise.

### D. "[T]he injury from disclosure to the relationship in which the record was generated" is at least neutral.

The fourth factor looks at the relationship between the patient and the entity that created the medical record. This factor is similar to the first three in that it will almost always militate against disclosure of patient records to the Government by providers—because a medical provider will always be able to say that its relationship with its patients will be affected by it

having to produce patient files to the Government.[4] Similar to the lack of insight given by the first three factors, this means that in any case involving a sensitive area of medicine, the Government has four out of seven *Westinghouse* factors weighing against it before subpoena enforcement even begins. This would create an "exception" to HIPAA subpoena enforcement that would essentially swallow the rule. *EEOC v. Am. Exp. Centurion Bank*, 758 F. Supp. 217, 221 (D. Del. 1991) ("[T]he federal courts are and should be most cautious about interfering with the investigative power delegated by Congress to agencies[.]").

Although the Government does not doubt that the relationship between CHOP and its patients might be somehow affected by CHOP being investigated and thus having to provide its patients' medical records to the Government, there is no meaningful way to test this speculation. This assertion would also be true in nearly every health care investigation of any medical provider. The fourth factor should be weighed as neutral here, as it should in any Government investigation of a medical provider.

In sum, CHOP's potential showing on the first four factors—which are really just one factor—is clearly outweighed by the Government's need for patient records in order to investigate—pursuant to a statutory mandate—expressly prohibited potential misconduct in the healthcare field, in this case involving lifelong consequences to vulnerable minors. And if this issue still hangs in the balance—it should not—the statutory privacy protections resolve any doubt in the Government's favor. A conclusion to the contrary would hamstring the Government's ability to carry out its statutorily authorized mandate to investigate misconduct relating to healthcare.

---

[4] The only realistic scenario in which factor four would not weigh against the Government is something like *Westinghouse* itself, where the record was created or held by an employer or some other non-medical entity.

## CONCLUSION

For the reasons explained above, the United States respectfully requests that the Court deny CHOP's motion in its entirety. The government stands ready and willing to meet and confer with the hospital about practical ways to mitigate its concerns about patient privacy.

Dated this 4th day of August, 2025.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

BRETT SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

SARMAD KHOJASTEH
Senior Counsel
Civil Division

LISA K. HSIAO
Acting Director


 /s/ Patrick R. Runkle
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors
SCOTT B. DAHLQUIST
Trial Attorney

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
Tel:     202-532-4723
Fax:    202-514-8742
patrick.r.runkle@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I caused this document to be filed electronically with the Court's CM/ECF system and is available for viewing and downloading from the CM/ECF system; the CM/ECF system will serve it on all counsel of record by operation of the CM/ECF system this 4th day of August, 2025.

                                                */s/ Ross S. Goldstein*
                                                ROSS S. GOLDSTEIN