**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: ADMINISTRATIVE SUBPOENA NO. 25-1431-014 | MISCELLANEOUS ACTION<br><br>NO. 25-mc-0039-MAK |

**RESPONSE OF THE UNITED STATES TO CHOP'S SUPPLEMENTAL BRIEF**

The Children's Hospital of Philadelphia ("CHOP") continues its meritless attacks on a legitimate federal investigation. Its supplemental brief (ECF No. 33) questions a sworn declaration made by the Acting Director of the Enforcement and Affirmative Litigation Branch (the "Hsiao Declaration") and mischaracterizes the legal basis for the Government's investigation. The Hsiao Declaration explains how the subpoena seeks specifically defined records necessary to assess potential violations of the Federal Food, Drug, and Cosmetic Act ("FDCA") that concern the labeling and distribution of puberty-blocker and cross-sex hormone drugs for administration to minors for intended uses not approved by the Food and Drug Administration ("FDA").

**ARGUMENT**

**1. The Hsiao Declaration, filed in a related case, is properly before the Court.**

The Hsiao Declaration, filed originally in 25-mc-54, provides sworn factual context for the Government's nationwide investigation into potential FDCA violations involving the use of potentially misbranded drugs for unapproved uses in pediatric patients. This Court recognized 25-mc-54 as related to this one. *See* Order, 25-mc-54, ECF 6 (noting that it would decide 25-mc-54 "consistent with our ongoing review in No. 25-mc-39"). CHOP argues that this Court should

ignore the Hsiao Declaration because it was filed originally in 25-mc-54 and not this matter—even though both matters are still *sub judice* and both ask for identical relief: quashing the same portions of the same subpoena. Because the Court has indicated that it intends to consider the matters together, it naturally makes sense that the Court consider the combined record when deciding them. Ignoring the Hsiao Declaration in this matter, but considering it in the related matter considering the identical questions, would seem to be the type of "arid ritual of meaningless form" that this Court need not endorse. *Cf. Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 65 (3d Cir. 2023). Besides, courts may take judicial notice of filings in related proceedings. *See, e.g.*, *Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 168 n.1 (D.D.C. 2019) (noting that courts resolving a "flood of cases" regarding terrorist attacks have "regularly taken judicial notice of the record in related cases").

    The Government's reason for filing the declaration in 25-mc-54 when it did is understandable. In the time since the United States filed its opposition brief in this matter, other courts have faulted the Government for not providing its detailed legal theories and factual basis for its investigation in those matters. Although the United States respectfully disagrees with those rulings, which are inconsistent with the Supreme Court's decision in *United States v. Morton Salt Company*, 338 U.S. 632 (1950), this Court has received those decisions through the Government's required status updates. Accordingly, it was both prudent and reasonable to submit the Hsiao Declaration promptly to this Court, in the event the Court finds the reasoning of those decisions persuasive regarding the need for additional information beyond that required by *Morton Salt* and other similar decisions. Thus, supplementing the record in this case is not gamesmanship but a prudent measure to ensure the Court has the benefit of a full and complete record of all relevant information as it decides the two nearly identical matters together.

Regardless, the Declaration has now been submitted to the Court in this matter by CHOP itself. ECF 33, Ex. A.

2. **The Hsiao Declaration is reliable.**

CHOP's attacks on the Hsiao Declaration reflect a basic misunderstanding of its purpose. It is intended to summarize investigative leads and the statutory bases for the Government's inquiry; the Declaration is not offered to prove every factual allegation[1] but merely to show that the subpoena serves a legitimate investigative purpose.

CHOP seems to overlook the fundamental point that a subpoena is investigative, not accusatory. It is issued to gather information—not because the Government has already determined that a violation has occurred. *See Morton Salt Co.,* 338 U.S. at 652 ("Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest."). Furthermore, the issuance of the subpoena to CHOP does not necessarily mean that CHOP itself is the subject or target of the investigation. The subpoena remains valid even if the Government is merely seeking information from CHOP that is relevant to potential misconduct by others. The Hsiao Declaration therefore provides context for assessing the subpoena's relationship to the statutory authority for its issuance, not for evidence that the Government is contemplating an enforcement action against the hospital, or of the merits of any such action.

---

[1] CHOP devotes two paragraphs to chastising the Government for correcting an inadvertent error in the Declaration which had referenced the filing of a lawsuit by a patient who received treatment at the facility. ECF 33 at 4–5. While the Government certainly regrets its error, it acted immediately to correct the record as soon as it learned of it, and CHOP has suffered no prejudice as a result. Moreover, CHOP's conjecture about the source of that mistake is not only inaccurate but irrelevant.

### 3. CHOP's efforts to paint the Government's investigation as a complete overhaul of food and drug law is a strawman that the Court should reject.

The briefing in this matter has regrettably strayed from the original, privacy-centered dispute that CHOP initially presented to the Court. Unlike the related challenges in other courts to subpoenas issued as part of the Government's investigation, CHOP opted to pursue a "hybrid" approach to its subpoena; it chose to comply with most of the subpoena—that is, the requests that did not request specific patient information—and to challenge the requests that did seek such information on the basis of the patients' privacy interests. The separate lawsuit brought on behalf of several patients (25-mc-54) likewise seeks to only quash the portions of the subpoena seeking their records.

Yet, CHOP (and the states in their amicus brief) now swing for the fences, asking this Court to decide arcane questions about the Government's theoretical ability to enforce federal law in the area of the distribution of prescription drugs for intended use not approved by FDA. The parties, amici, and the Court now find themselves far afield from any discussion of the *Westinghouse*-focused privacy dispute that CHOP presented to the Court for determination when it initiated this litigation.

The Court should reject CHOP's (and amici's) attempt to muddle the issues about subpoena enforcement and whether an enforcement action could be successfully brought under hypothetical facts. Wading into these issues to determine the propriety of the subpoena is exactly what this Court should *not* do here. *See United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5 (1st Cir. 1996) ("We have repeatedly admonished that questions concerning the scope of an agency's substantive authority to regulate are not to be resolved in subpoena enforcement proceedings."); *see also Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 210–11 (1946) (explaining that court may not refuse to enforce administrative subpoena on ground that agency may lack

statutory coverage over respondent since "the question at issue is not … the nature of the legal obligation violation of which the evidence is sought to show" but rather whether relevant evidence to that issue is sought by subpoena); *ICC v. Gould,* 629 F.2d 847, 853 (3d Cir. 1980) (explaining that where agency "arguably has jurisdiction to inspect," issues such as whether respondent actually engages in regulated activities "are to be determined in the first instance by summary inspection procedures and need not first be litigated in court."); *Houser v. Feldman*, No. 21-0676 2021 WL 4963534, at *2 (E.D. Pa. Oct. 26, 2021) (citing *Walling* and *Morton Salt Co.* and stating that "investigations should not be stopped at the threshold of inquiry because doing so would render substantially impossible the effective discharge of the duties of investigation and enforcement which Congress has placed upon the agency." (citation modified)); *FTC. v. Swanson*, 560 F.2d 1, 2 (1st Cir. 1977) ("An agency's investigations should not be bogged down by premature challenges to its regulatory jurisdiction."). Acceptance of CHOP's view would require the Court to resolve, in advance, the complex factual and legal questions that Congress has entrusted to the enforcing agencies to determine in the first instance.

But even if this Court is inclined to consider these arguments, they suffer from an obvious logical flaw—they proceed from the false premise that the Government is attempting to criminalize routine, non-fraudulent off-label prescribing by physicians and other healthcare professionals. To be absolutely clear: the United States is not doing so. Indeed, the Government takes little issue with much of the off-label discussion presented by CHOP and amici. Again for clarity, the United States agrees that licensed professionals are permitted to engage in off-label prescribing for individual patients in their good-faith medical judgment.

However, the FDCA—and the HIPAA subpoena authority at issue here—empowers the Attorney General to inquire into conduct that may constitute manufacture, distribution or

misbranding of unapproved drugs, even where those products ultimately reach patients through physicians. All the Court must do is to construe the FDCA's text according to its plain terms in order to determine the Government's general statutory authority to *investigate*. The FDCA and its implementing regulations make it unlawful to distribute drugs in interstate commerce when the intended use of those pharmaceuticals is not an FDA-approved indication and/or where the drug does not have adequate directions for that intended use. Congress may have intended to preserve some independence of medical judgment, but it did not intend to insulate from scrutiny every transaction that happens to involve a licensed practitioner. The Court of Appeals for the D.C. Circuit explained this issue succinctly and correctly:

> The FDCA enacts a comprehensive, uniform regulatory scheme for the distribution of drugs. The scheme's breadth—and, more specifically, its applicability to doctors—is evident in the fact that the FDCA *carves out* certain exceptions from its requirements for doctors who manufacture and administer drugs in the course of their professional practice. ... Those exceptions would be unnecessary if the FDCA did not otherwise regulate the distribution of drugs by licensed physicians. *See United States v. Evers,* 643 F.2d 1043, 1048 (5th Cir. 1981) ("[W]hile the [FDCA] was not intended to regulate the practice of medicine, it was obviously intended to control the availability of drugs for prescribing by physicians."). Appellants' construction of the FDCA, by contrast, would allow states to gut the FDCA's regulation of doctors, and thereby create an enormous gap in the FDCA's coverage, by classifying the distribution of drugs by doctors as the practice of medicine. Given Congress's intent that the FDCA's "coverage be as broad as its literal language indicates," *United States v. An Article of Drug ... Bacto–Unidisk,* 394 U.S. 784, 798, 89 S. Ct. 1410, 22 L. Ed. 2d 726 (1969), such a construction is not tenable.

*United States v. Regenerative Scis., LLC*, 741 F.3d 1314, 1319–20 (D.C. Cir. 2014); *see also United States v. Jackson*, 126 F.4th 847, 860 (4th Cir. 2025) (rejecting view that physicians are categorically exempt from FDCA prosecution merely because FDCA-prohibited conduct occurred in medical treatment context); *United States v. California Stem Cell Treatment Ctr.,*

*Inc.*, 117 F.4th 1213, 1220 (9th Cir. 2024) (rejecting physicians' "practice of medicine" defense to FDCA violations involving unapproved drug).[2]

The FDCA says what it says, and its plain meaning gives the United States a role in ensuring that unapproved drugs do not harm the public health. The Government is entitled to determine whether entities involved in procuring, labeling, and distributing puberty blockers or cross-sex hormones have done so in compliance with federal law. In other words, the Government must be able to investigate whether FDA-regulated drugs are being distributed in interstate commerce for an unapproved intended use. The United States has performed this function for decades and such investigations have produced countless successful enforcement actions, both civil and criminal. Such an inquiry may necessarily encompass medical institutions like CHOP, which likely holds relevant records of sourcing, labeling, and/or distribution practices. The subpoena seeks information that could elucidate the circumstances surrounding the interstate distribution of these drugs for these purposes—not to evaluate individual physicians' medical judgment, but to determine compliance with the FDCA's provisions, including labeling.

Indeed, even accepting every CHOP criticism of the Government's legal theories, the hospital seems to agree that it could have received misbranded drugs in interstate commerce—which is the result if a prescription drug is shipped by a manufacturer who intends it to be used for the unapproved indication. If such an unlawful shipment occurred, CHOP or its personnel could have aided and abetted that act or conspired with others to obtain its commission—or CHOP simply could have been a witness to the illegal shipment. If the Government can investigate the distribution of drugs intended for off-label use—which CHOP seems to agree it

---

[2] *See also* the cases cited by CHOP in its brief, ECF 33 at 8 n.7, in which physicians were charged with FDCA violations in the context of practicing medicine.

can (ECF 33, at 6 n.5)—the Government must also *ipso facto* be able to investigate the circumstances under which hospitals received those unlawful shipments of misbranded drugs and what happened to them after CHOP received them—even assuming that CHOP physicians acted entirely within the practice of medicine. The Government may nonetheless seek information that could reveal *others'* violations, including whether information provided to physicians or insurers was false or misleading. Nothing in either the FDCA or 18 U.S.C. § 3486 confines the Government's investigative reach to subpoenaing direct targets; rather Congress authorized subpoenas to be sent wherever relevant information may be found. Practicing medicine simply does not create an FDCA-free zone as CHOP seems to suggest.

## CONCLUSION

Congress vested the Attorney General with broad authority to investigate potential violations of the FDCA, including the unlawful distribution and misbranding of drugs. The subpoena here is a routine and necessary exercise of that authority. CHOP's (and amici's) effort to transform a discrete subpoena dispute into a sweeping challenge to the Government's power and interpretation of the FDCA is not supportable. In issuing the subpoena to CHOP, the Government is not attempting to regulate or criminalize the practice of medicine, but rather to do what it has traditionally always done in this field—protecting public health by ensuring the integrity of the comprehensive regulatory framework Congress established to ensure the safety and efficacy of powerful drugs for use by the American public. Because, and as the Hsiao Declaration makes plain, the subpoena seeks information directly relevant to that inquiry, the Court should deny CHOP's request to limit it.

Dated, this 3rd day of November, 2025.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director

 /s/ Patrick R. Runkle
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors

SCOTT B. DAHLQUIST
Trial Attorney

United States Department of Justice
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
Tel:       202-532-4723
Fax:      202-514-8742
Patrick.r.runkle@usdoj.gov

## CERTIFICATE OF SERVICE

  I hereby certify that on November 3, 2025, a copy of the foregoing Response to CHOP's Supplemental Brief was filed electronically and is available for viewing and downloading from the Court's CM/ECF system. Notice of this filing will be sent by operation of the Court's CM/ECF system to all parities of record as indicated on the electronic filing receipt.


             */s/ Patrick R. Runkle*