UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ADMINISTRATIVE SUBPOENA NO. 25-1431-014 | MISCELLANEOUS ACTION<br><br>NO. 25-mc-0039-MAK |

**RESPONSE OF THE UNITED STATES
TO THE BRIEF OF MULTISTATE AMICI CURIAE**

    As with CHOP in its most recent brief, amici here stray far from the narrow issue before this Court. This miscellaneous action is not a policy debate about the appropriate treatment for pediatric gender dysphoria or the finer points of federalism. Rather, the question before the Court is simply whether the United States can obtain the patient-specific information it needs to assess potential violations of federal law—nothing more. The Attorney General's issuance of the subpoena does not herald a Governmental effort to criminalize legitimate, good-faith off-label prescribing. Amici seek to transform a garden-variety subpoena enforcement dispute into a constitutional controversy and thereby ask the Court to do what the Supreme Court has forbidden: derail a legitimate federal inquiry by predetermining who might ultimately be held liable and under what legal theory, all before the facts have been determined by the investigative agency. The subpoena is investigative, not accusatory, and falls squarely within the Government's authority to examine whether powerful prescription drugs—drugs that have not been demonstrated to be safe or effective in treating any psychiatric disorder—are being distributed in accordance with federal law.

**ARGUMENT**

1. **The subpoena seeks information relevant to a legitimate federal investigation of commercial conduct, not medical judgment.**

As discussed in the Government's prior briefing, Congress vested the Attorney General with broad authority to issue administrative subpoenas to investigate federal healthcare offenses, including potential violations of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 *et seq.*, "FDCA"). *See* 18 U.S.C. § 3486(a). Such violations include the distribution of unapproved and misbranded drugs in interstate commerce. 21 U.S.C. § 331(a). They also include the causing or doing of any act that results in the drug becoming misbranded while "held for sale." 21 U.S.C. § 331(k). The Attorney General's administrative subpoena authority reaches "any records or other things relevant to the investigation." 18 U.S.C. § 3486(a)(1)(B)(i).

The states' opening contention that the subpoena is "without justification" (ECF 36, at 1) demonstrates their fundamental misunderstanding of federal law. The Supreme Court has made clear that the Government need not have any proof of any wrongdoing—on the part of anyone—as a precondition to compelling the production of relevant documents through an administrative subpoena. *See United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950) ("[The Government] can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."). Thus, even "official curiosity" is justification enough. *Id.* at 652.

To be sure, however, the Government's official curiosity here is well-founded. For example, through its nationwide investigation, the United States has identified instances where drug manufacturers marketed puberty-blocker drugs and cross-sex hormones directly to pediatric transgender programs and appear to have entered into "consulting agreements" with prescribing clinicians at those pediatric gender clinics. The institutional records the Government seeks are

necessary to determine the facts surrounding how these drugs have been labeled, promoted, and distributed for these unapproved uses. As the Hsiao Declaration (ECF 33, Ex. A) explains, the subpoena's requests are directly related to the Government's mandate to enforce to the FDCA and are thus relevant and reasonable. Discovering the facts surrounding these transactions is precisely why Congress granted the Attorney General the subpoena power.

Amici invoke state control of "the practice of medicine" to suggest that—merely by issuing a subpoena to investigate—the federal government is encroaching on state sovereignty in general and criminalizing off-label prescribing in particular.[1] That is simply wrong. The Government is seeking to do neither. The Hsiao Declaration explains that the Government's focus is on whether puberty-blocking and cross-sex hormone drugs were misbranded or introduced into commerce for unapproved intended uses—violations of federal law. *See* 21 U.S.C. § 352(a) (drugs are deemed misbranded for false or misleading labeling); 21 U.S.C. § 352(f) (drugs are deemed misbranded if (1) labeling does not bear adequate directions for use or (2) labeling does not bear adequate warnings against use by children where such use may be dangerous to health); 21 U.S.C. § 331(a) (prohibiting introduction or causing introduction into interstate commerce of misbranded drug); 21 U.S.C. § 331(c) (prohibiting receipt in interstate commerce of misbranded drug and delivery or proffered delivery of it to another); 21 U.S.C. § 331(d) (prohibiting introduction into interstate commerce of an unapproved new drug); 21 U.S.C. § 331(k) (prohibiting alteration of drug's labeling or doing any other act that results in drug becoming

---

[1] The alarmist parade of horribles put forth by Amici—that this District Court's enforcement a single subpoena for a subset of institutional records of a Philadelphia hospital—will "threaten the health and welfare of the people" across *fifteen* different states (in addition to Pennsylvania), "impede core economic activities" of those states, and "encroach" on the regulation of medicine within those states is more than mere hyperbole. ECF 36 at 2. The sweeping claims of Amici demonstrate the speculative and overtly political nature of their objections, rather than any bona fide sovereignty concern.

misbranded while drug is held for sale). The subpoena seeks records from CHOP that illuminate whether any of these prohibited acts occurred and by whom.

Perhaps more importantly, some requests—like the patient specific records at issue here—are necessary to assist in the determination whether any of these prohibited acts occurred with the intent to defraud or mislead, making those acts federal felonies. 21 U.S.C. § 333(a)(2); *see* Hsiao Decl., ECF 33, Ex. A, at ¶ 41 (explaining relevance to investigation of patient-specific requests in subpoena). The subpoena's requests are targeted for information bearing on these commercial practices involving federally-regulated drugs, not to evaluate the physicians' clinical-decision making at the bedside.

Amici describe the use of these powerful drugs to modify a child's secondary sexual characteristics and appearance as "essential and life-saving" and "medically necessary" (ECF 36, at 1), implying that any law-enforcement inquiry about it will endanger lives and thus any such use should be immune from investigation. But the Government's mere issuance of a subpoena does not halt care, alter treatment decisions, or regulate medical practice. The Government has not prohibited treatment or restricted prescribing, it has simply asked for records. And whether a drug has been distributed unlawfully for an unapproved use or is misbranded is a matter of statutory compliance; medical consensus and clinical impressions are irrelevant to that inquiry, otherwise there would be no need for FDA regulation of drugs at all.[2] *Cf. Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 619 (1973) (noting that legislative history of portions of

---

[2] Amici portray the use of these drugs as a treatment for gender dysphoria and related disorders as medically uncontroversial. This is false and inconsistent with the current state of scientific evidence and international medical consensus. *See* Hsiao Decl., ECF 33 Ex. A, at ¶¶ 24–29 (describing findings of U.S. Department of Health and Human Services and United Kingdom National Health Service's independent *Cass Review* acknowledging remarkable lack of evidence for safety and effectiveness of these medical interventions, as well as several European countries' restrictions on use of puberty blockers and cross-sex hormones for minors). In fact, the medical community remains divided and the science is—at best—unsettled.

FDCA "show a marked concern that impressions or beliefs of physicians [regarding a drug's efficacy], no matter how fervently held, are treacherous."). Congress entrusted ensuring that drugs introduced into interstate commerce meet requirements for safety, effectiveness, and labeling for their intended uses to the United States, not Amici. *See* 21 U.S.C. § 337(a) (with some exceptions relating to food, "all such proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States.").

2. **Amici's effort to paint the Government's investigation as an unprecedented overhaul of food and drug law fares no better than CHOP's nearly identical argument in its supplemental brief.**

Amici, like CHOP in its supplemental brief (ECF 33), claim that the Government seeks to eliminate off-label prescribing or to rewrite the FDCA beyond recognition. This strawman should fare no better than CHOP's does for the same reasons as explained in the Government's response to that brief (ECF 37), which are incorporated herein by reference.

The Government does not challenge the legitimacy of physicians' individualized, good-faith medical judgment in prescribing approved drugs for unapproved uses. Rather, the Government is focused on the labeling and distribution of those drugs in interstate commerce, not the clinical practice of medicine. As the United States has already explained, the investigation concerns whether entities in the drug supply chain, including hospitals, manufacturers, and distributors, have (either by themselves or through a conspiracy) caused the introduction of misbranded or unapproved drugs into interstate commerce (or have misbranded them while held for sale). The insistence of Amici to reframe an ordinary investigative subpoena into a referendum on the freedom of physicians to prescribe drugs off-label is entirely misplaced.

Congress enacted the FDCA to ensure that safety and efficacy determinations for drugs—and the adequacy of their labeling—are made by experts at the agency entrusted with protecting public health, not by manufacturers or even well-intentioned clinicians. *See Weinberger,* 412 U.S.

5

at 630 (explaining that Congress concluded "based upon hearings, that clinical impressions of practicing physicians and poorly controlled experiments do not constitute an adequate basis for establishing efficacy."). The Government agrees with Amici that doctors may *generally* prescribe off label, but at the same time, "Congress fully intended the Act's coverage be as broad as its literal language indicates." *United States v. Article of Drug … Bacto-Unidisk*, 394 U.S. 784, 798 (1969). An investigation involving potential misbranding and unapproved drugs necessarily will therefore touch upon off-label prescribing. That does not mean the Government seeks to criminalize it.[3]

### 3. The privacy and state-law theories that Amici put forth cannot block federal process.

Amici rely on Pennsylvania state constitutional provisions and state court privacy precedents that simply have no bearing on this federal proceeding; the state-law privacy principles they put forth cannot diminish the federal subpoena power. The subpoena here was issued under the authority of an Act of Congress. *See* 18 U.S.C. § 3486. The Supremacy Clause of the United States Constitution thus leaves no room for a state's veto. *See* U.S. CONST. art VI, cl. 2 ("[T]he Laws of the United States … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *see also United States v. Colorado Dep't of Lab. & Emp., Div. of Workers' Comp.*, No. 123CV01968CNSKAS, 2023 WL 8259047, at *3 (D. Colo. Nov. 29, 2023)

---

[3] Amici erroneously invoke 21 U.S.C. § 396, demonstrating a misunderstanding of the FDCA. (ECF 36 at 14). Section 396 is a narrow carve-out that by its explicit terms applies only to *devices,* not *drugs*. 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed **device** to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." (emphasis added)). Congress chose not to enact any comparable carve-out provision for drugs. And the products Amici describe—implanted puberty blockers—are regulated by the FDCA as drugs under 21 U.S.C. § 321(g)(1), not as devices as Amici incorrectly assert. *See, e.g.*, FDA, *Drug Approval Package: Supprelin LA (histrelin acetate) NDA [New Drug Application] No. 022058* (May 3, 2007), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2007/022058_supprelin_la_toc.cfm.

(upholding federal administrative subpoena notwithstanding state confidentiality law because "'state law that conflicts with federal law is without effect.'" (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)); *EEOC v. City of Orange, Tex.*, 905 F. Supp. 381, 382 (E.D. Tex. 1995) (same, because "[w]here a state statute conflicts with or frustrates federal law, the former must give way." (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993)). While Pennsylvania courts may interpret their constitution to provide a broad right of privacy, those rulings have no force here to the extent they conflict with the federal statute authorizing the collection of "any records or other things relevant to the investigation." 18 U.S.C. § 3486(a)(B).

**4. The Court should not resolve hypothetical policy or merits questions here.**

Amici devote significant portions of their brief to predicting the supposed consequences of a future enforcement action. In doing so, the states urge the Court to decide whether such an action would be wise public policy. *See* ECF 36 at 17–20. As the Government explained in its response to CHOP's supplemental brief (ECF 37, at 4–5), these are precisely the sort of hypothetical policy arguments that courts have long counseled against entertaining in a subpoena enforcement proceeding.

The question of whether FDCA liability exists and as to whom is not before the Court. At this stage, the only question is whether a federal administrative subpoena seeking records relevant to a legitimate law enforcement investigation should be upheld against CHOP's challenge. It is not whether the United States would, could, or should bring an enforcement action under a set of hypothetical facts. Nor is it whether CHOP's compliance with the subpoena will—as Amici argue—"jeopardize[] entire fields of medicine." ECF 36 at 17. The Court should therefore hew to the narrow question that CHOP (and its patients) has actually put before it: whether the privacy interests asserted can override a HIPAA subpoena lawfully issued in the course of a legitimate investigation of federal healthcare offenses.

7

## CONCLUSION

This case does not ask the Court to decide questions of medical policy, federalism, or medicalized sex trait modification as a treatment for gender dysphoria. Rather, the question is one of law and is straightforward: whether the United States may obtain institutional records relevant to a legitimate investigation under statutes that Congress enacted and entrusted to federal enforcement. The subpoena is investigative, not accusatory; its enforcement will neither criminalize off-label prescribing nor force any alteration of clinical practice. The Court should reject the speculative arguments advanced by CHOP and Amici and uphold the subpoena, allowing the Government to do what it has always done: determine the facts so that the law can be appropriately applied.

Dated, this 4th day of November, 2025.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director

 /s/ Ross S. Goldstein
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors

SCOTT B. DAHLQUIST
Trial Attorney

United States Department of Justice
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044

Tel: 202-353-4218
Fax: 202-514-8742

Ross.Goldstein@usdoj.gov

## CERTIFICATE OF SERVICE

    I hereby certify that on November 4, 2025, a copy of the foregoing Response to the Brief of Amici Curiae was filed electronically and is available for viewing and downloading from the Court's CM/ECF system. Notice of this filing will be sent by operation of the Court's CM/ECF system to all parties of record as indicated on the electronic filing receipt.

    Dated this 4th day of November, 2025.

                                                          */s/ Ross S. Goldstein*